FRANK B. LeCLEAR v. THOMAS B. PERKINS AND FIDELIA M. RICHMOND.

*Malicious prosecution—Attachment—Probable cause—Malice—Advice of counsel—Evidence.*

1. Want of probable cause and malice must concur, to entitle the plaintiff to recover in a suit for the malicious prosecution of a writ of attachment.

2. In an action for the alleged malicious prosecution of a writ of attachment, the defendant may show that he acted under the advice of counsel, before whom he had placed all of the facts, and the jury may consider such advice in determining the questions of probable cause and malice.[1]

3. The testimony of plaintiff's bookkeeper as to her knowledge of his business and financial affairs at the time of the attachment, and his efforts to borrow money, was admitted, and those elements were included in the charge to the jury as part of what was claimed by the defendants to justify the attachment, she having previously communicated such facts to them. And it is held that the testimony was competent and admissible as bearing upon the questions of probable cause and

[1] For cases bearing upon the *effect* of legal advice as a defense in an action for malicious prosecution, see *Harris v. Woodford*, 98 Mich. 147, and note; *Govaski v. Downey*, 100 Id. 429; *Thompson v. Price*, 100 Id. 558.

malice, and to enable the jury to say whether the defendants
did more than what careful and prudent men would have done
under like circumstances; citing *Brand v. Hinchman*, 68
Mich. 601.

Error to Kent.   (Grove, J.)   Argued November 20, 1894.
Decided December 18, 1894.

Case.   Plaintiff brings error.   Affirmed.   The facts are
stated in the opinion.

*Maher & Salsbury*, for appellant.

*Sweet & Perkins*, for defendants.

LONG, J.   This is an action for damages for the mali-
cious prosecution of a writ of attachment.   The writ of
attachment was issued and levy made February 24, 1891.
It was dissolved by an order of Judge Adsit, of the Kent
circuit, March 7, 1891.   This suit was commenced October
19, 1893.   The ground of issuing the attachment was that
the defendant in the writ (plaintiff here) was about to
assign and dispose of his property with intent to defraud
his creditors.

Mr. Le Clear, the defendant in the writ, was a photog-
rapher at Grand Rapids, and was indebted to defendants
in the sum of about $500.   Before the writ of attachment
was sued out, a Miss Sherman, who was an employé of
Le Clear, came to Mr. Perkins, one of the defendants,
and made certain statements as to Le Clear's affairs.   Mr.
Perkins testified upon the present trial as to what was
said on that occasion by Miss Sherman, as follows:

" *Q.* State what, if any, conversation you had with Miss
Sherman, leading to the attachment which you com-
menced.

" *A.* Miss Sherman had spoken to me about getting her
another position three or four days before this attachment.
The attachment was commenced on Tuesday, February 24.
On Saturday before the attachment, she came into the

store, and asked if I had heard of any position for her, and it was then that this conversation took place in reference to why she wanted to or was going away from Mr. Le Clear's. She said it was because business was so dull that he could not keep her any longer. I asked her how dull the business was. She says, 'We are doing next to nothing.' I said: 'How many negatives is that?' She says, 'A good many days we don't make a negative, and in one week was only one negative, and that was of some flowers.' And I says, 'How is it that he can pay expenses on so little work as that?" and she said he could not, as she saw; she didn't see how he could. And I said, 'It looks to me as though our claim was in a pretty poor shape.' She says, 'How much is your claim?' I told her it was a little more than $500. 'Well,' she said, 'I don't see how you are ever going to get it, because he owes so much already, and his creditors are pushing him so hard for their claims that he has resorted to hiding from them, and asking me to state when they came that he is not there, when in fact he is. He has also expressed himself as afraid of you,—particularly so.' I think, right then, I asked her why she was going to Cadillac, when I saw her a few days before, —if she had expected to get a job there,—and she said, 'No; I was going on business there for Mr. Le Clear.' I said, 'What business for Mr. Le Clear up there?' And she said, 'To borrow money.' I inquired from whom, and she told me a Dr. Ward, a friend of hers that was there, that loaned money sometimes. I asked her what security Le Clear proposed to give to this Dr. Ward, and she said, 'A mortgage on the gallery.'

"Q. Was the amount mentioned?

"A. Yes; I think that she said $1,250 was the amount he wanted; but she said he had failed to get that money, and that now he was going to Detroit, and asked her to wait until he could get back. I said, 'When is he going to Detroit?' She said, 'In a day or two, but he don't want me to let any one know that.' And I said, 'What does that mean,—that he don't want any one to know it? Does that mean mischief?' 'Well,' she says, 'you can draw your own conclusion as to what it means.' I says, 'Don't it look to you as though he intends to do something that he don't want the creditors to know?' She says, 'That is the way it looks.' And I says, 'What do you think that means?' She says, 'I think it means that he intends to transfer his gallery to his father.' 'Why do

you think that?' 'Because his father, when here a short
time before, told Frank that he would not help him one
more dollar until he had either turned the gallery over to
him, or given him a mortgage for security;' that Frank
had refused to do that, on the ground that if the 'old
man,' as he called him, got hold of it, he (Frank) would
be left out in the cold, and have nothing; and that he at
that time was expecting or hoped to get money from this
Cadillac party, but now that he had failed in that he was
going to Detroit, as she believed, 'to turn his gallery over
to him, as the last resort.' Then I said: 'That would
look as though it would be necessary for me, in order to
secure myself, to make some move, and that right away.
Wouldn't it to you?' She says, 'Yes, I do. If you can
secure yourself, I would do it; but, whatever you do, do
at once, because I believe if he goes to Detroit he will
transfer the gallery, and you will never get a cent out of
your claim.'

"*Q.* I will ask you, Mr. Perkins, what information, if
any, at that time, you had, relative to the amount of
Frank Le Clear's indebtedness.

"*A.* I knew at that time that he owed nearly all of
these claims that he has testified about himself, includ-
ing—

"*Q.* From whom did you get your information?

"*A.* A great majority from Frank himself, and some
from Miss Sherman at that time.

"*Q.* Did you get this from Frank in his conversation?

"*A.* No. He had been telling me at different times
within the past,—we will say two or three months prior
to this February 24, when I had been talking with him
about paying our debt.

"*Q.* Did he volunteer the information in regard to other
indebtedness?

"*A.* He had offered that as an excuse, where he had
made some other payments, for not paying ours. Then I
had quizzed him as to what he was owing, and found out
that he was owing the Phoenix people, which I had no
idea that he was owing; knew he had bought his house on
a contract. And the Ocher & Ford matter,—I did not
know anything about it until I asked him about it, what
he was owing so much for, something like that.

"*Q.* Had you asked him about that, and received infor-
mation about it, prior to this talk with Miss Sherman?

"*A.* Yes, sir.

"*Q.* After that conversation, what was the next thing you did, or what did you do, if anything, regarding the collection of that claim?

"*A.* This conversation took place on Saturday,—I have referred to,—and Monday I went to Mess. Butterfield & Keeney, and saw Mr. Butterfield, and told him all the facts I have set forth here, as near as I can remember now, and I asked him if there was anything I could do to protect myself against a loss in that case. Mr. Butterfield thought a few moments, and he says: 'Yes; you can get out a writ of attachment. It is your only course to pursue.'

"*Q.* What was done then?

"*A.* He then called Mr. Keeney, who had just come in, I think, from outside—

"*Q.* That is his partner?

"*A.* His partner—into the office, and told him what had been said; and he says: 'I have advised a writ of attachment. What do you think of it?' Mr. Keeney says, 'I don't see any other chance for him, or any other way for him to proceed.' Mr. Butterfield says to him then to 'go on and draw up this writ;' that he himself had to go, I think, to Lansing.

"*Q.* Well, what was done?

"*A.* And Mr. Keeney did go on and draw up this paper, and the next day I went down there in the morning, and swore to it, and he called the sheriff over, and put the papers in his hands to serve.

"*Q.* I would like to ask you why you consulted Butterfield & Keeney with regard to this matter.

"*A.* Well, I considered Mr. Butterfield,—I don't know about Mr. Keeney,—but I considered Mr. Butterfield about as good authority as we had here, and I thought I wanted the best counsel I could get.

"*Q.* Did you know anything about his character and standing as an attorney?

"*A.* I had always heard him spoken of in the very highest terms."

Mr. Butterfield, the attorney referred to by Mr. Perkins, was called as a witness, and testified to statements made by Mr. Perkins to him, and the advice he gave him, as follows:

"*Q.* You may please proceed to state what the facts

stated to you by Mr. Perkins with reference to that claim against Mr. Le Clear were.

"*A.* I do not think, Mr. Sweet, I could give the language. I certainly would not undertake to after three years' time. But in substance it was this: He said that Mr. Le Clear was indebted to him in a large amount; that he had been carrying him, and that he had made numerous promises; that he had great confidence in him, I think, and that he had just found out that he was hopelessly in debt, and that he was going to Detroit for the purpose of putting his property—entire property which he had—out of his hands. I think he mentioned the conveyance to his father, or some member of the family. My impression is he said something about some property which had already been transferred, but I could not identify that.

"*Q.* I will ask you if Mr. Perkins said he knew that this was to be done, or stated that he had reason to believe it was to be done.

"*A.* What he stated to me was that he had learned it from some source; it was a bookkeeper or clerk, or somebody, of Mr. Le Clear's, from whom he said he had got his information. I could not identify the person, but he seemed to be very certain that his facts were true.

"*Q.* Upon that statement of facts on his part, what did you advise, if anything?

"*A.* The commencement of an attachment suit."

Cross-examined by Mr. Maher:

"*Q.* Did Mr. Perkins tell you what the extent of Mr. Le Clear's indebtedness was?

"*A.* He may have done so, but my impression is he simply confined himself to the statement that he owed so much that he had no hope of paying.

"*Q.* That he owed so much that he had no hope of paying?

"*A.* Yes; some general statement of that kind. He may have stated the amount, but I don't know.

"*Q.* And he stated to you that Mr. Le Clear was about to go to Detroit for the purpose of disposing of all his property?

"*A.* He said to me that he was informed by this (by the source of which I spoke to you) that he was about going to Detroit to dispose— He either said all his prop-

-erty, or the gallery and the stuff up there, which was all he had."

The court instructed the jury, substantially, that there were two questions of fact to be determined, in order to ascertain whether the plaintiff could maintain this action, viz., that the motive which the defendants in this suit had in commencing the attachment suit was malicious, and, second, that they caused it to be issued without probable cause for so doing; that, if the jury found that the attachment proceedings were commenced and prosecuted without probable cause, they were at liberty to infer malice; that, to constitute probable cause for the prosecution of attachment proceedings upon the claim that the debtor has done or is about to do some act or acts with intent to defraud his creditors, it is necessary that the person or persons instituting such proceedings should actually believe, and should also have good reason to believe, that the debtor has done or is about to do such act or acts with the fraudulent intent alleged against him; that mere belief that he has done or is about to do such fraudulent act is not sufficient to justify an attachment; that the attachment will be unlawful and illegal unless the belief is founded upon knowledge, or what is believed to be reliable information, as to facts which, if true, would justify the belief; that want of probable cause is an essential ground in this action, or one of the essential grounds; that other things may be inferred from this, but this cannot be inferred from anything else,—it must be established by positive and express proof; that the plaintiff had the right to deal with his property and dispose of it as he saw fit, so long as he did not seek to dispose of it with an intent to defraud his creditors. After disposing of these questions in a very able, lucid, and correct charge, the court took up the question of advice of counsel, and directed the jury as follows:

"There is another question for you to consider, which, in my opinion, bears both upon this question of malice and upon the question of probable cause, and that is the question of advice of counsel. And upon that question I charge you that advice of counsel can only be considered when the party seeking such advice has fully, fairly, and honestly stated all the facts and circumstances within his knowledge to the counsel of which he seeks advice. If the party seeking such advice, instead of fully and fairly stating the facts, stated as a matter of fact that which he did not know to be true, or had good reason to believe to be true, based upon the information which he possessed, and acting in good faith, then the advice of counsel would be no protection. Neither would it be any protection if it were resorted to merely for the purpose of covering a previous intent to do wrong; but the advice of counsel, when sought, must be sought in good faith, and all of the facts and circumstances within the knowledge of the party seeking it, and the information upon which he acts after receiving the advice of counsel, must be fully and fairly stated to the counsel in good faith, and the party seeking the advice must believe the facts and circumstances, as he narrates them, to be true.

"Upon this question of the advice of counsel, Judge Cooley, in his work on Torts, under the head of ' Malicious Prosecution,' at page 183, says:

" ' It may perhaps turn out that the complainant, instead of relying upon his own judgment, has taken the advice of counsel learned in the law, and acted upon that. This should be safer and more reliable than his own judgment, not only because it is the advice of one who can view the facts calmly and dispassionately, but because he is capable of judging of the facts in their legal bearings. A prudent man is therefore expected to take such advice, and when he does so, and places all the facts before his counsel, and acts upon his opinion, proof of the fact makes out a case of probable cause, provided the disclosure appears to have been full and fair, and not to have withheld any of the material facts.'

"And the Supreme Court, in a case in Monroe county, in 92 Mich., at page 75 [*Perry v. Sulier*], have said that—

" ' The person seeking and receiving such advice is in law as well as in morals justified in acting upon it, provided that he fully and fairly state the facts to the attorney.'

"And I charge you, gentlemen, that these extracts which I have just read state the law correctly, and you will apply that in your consideration of this case."

The jury returned a verdict in favor of the defendants.

The main contention of plaintiff's counsel is that the court was in error in permitting defendants to show the advice of counsel, and in directing the jury that they might consider this advice in determining the questions of probable cause and malice, the claim being that this rule does not obtain in causes growing out of the commencement of civil actions.

No distinction exists between criminal and civil actions upon the question as to want of probable cause and malice. In *Stewart v. Sonneborn,* 98 U. S. 192, it was said:

"It is abundantly settled that no suit can be maintained against an unsuccessful plaintiff or prosecutor unless it is shown affirmatively that he was actuated in his conduct by malice, or some improper or sinister motive. Malice is essential to the maintenance of any such action, and not merely (as the circuit court thought) to the recovery of exemplary damages. Notwithstanding what has been said in some decisions of a distinction between actions for criminal prosecutions and civil suits, both classes, at the present day, require substantially the same essentials. Certainly an action for instituting a civil suit requires not less for its maintenance than an action for a malicious prosecution of a criminal proceeding."

In *Williams v. Hunter,* 3 Hawks (N. C.), 545, where an attachment had been issued, it was said by Chief Justice Taylor:

"I cannot distinguish this case from an action for maliciously holding a party to bail, or suing out a writ when nothing is due, in which case the gist of the action is malice and the want of a probable cause."

In the following cases the actions were brought for wrongful prosecution of civil actions, and they hold that the rule is the same in civil actions as in criminal prosecutions: *O'Grady v. Julian,* 34 Ala. 88; *McCracken v.*

*Bank,* 4 Fed. Rep. 602; *Brewer v. Jacobs,* 22 Id. 222; *Emerson v. Cochran,* 111 Penn. St. 619; *Sledge v. Mc-Laren,* 29 Ga. 64; *Spengler v. Davy,* 15 Grat. 381; *Allen v. Codman,* 139 Mass. 136; *Live-Stock Co. v. Butchers' Union,* 120 U. S. 141. This same rule was applied in *Brand v. Hinchman,* 68 Mich. 601,—an action for maliciously suing out an attachment,—in which it was said:

" There is no doubt that, if the defendants honestly believed that they had probable cause, the mere fact that there was not in reality any probable cause would not render them liable. But it was for the jury to determine whether they honestly believed that they had probable cause, and they could only determine this by ascertaining what careful and prudent business men would have done under like circumstances."

But it is contended that the advice of counsel cannot protect a party in the prosecution of a civil action, and the fact that he relied upon the advice of counsel in suing out an attachment is no evidence of want of malice, and cannot be used in determining the question of want of probable cause. Prof. Tiedeman, in his note to *Sharpe v. Johnstone,*—a case from the Missouri supreme court,[1] and reported in 21 Am. Law. Reg. (N. S.) 576,—says:

"It is remarkable with what uncertainty the books speak of the manner in 'which the advice of counsel constitutes a defense. Some of the cases hold that it is proof of probable cause; some maintain that it disproves malice, in most cases imposing no limitation upon its scope; while others—and, it is believed, the majority of the cases—refer to it as establishing both the absence of malice and the presence of a probable cause."

In the present case the actual facts as to the purpose of Mr. Le Clear to dispose of his property with intent to defraud his creditors were in dispute. Just what Miss Sherman communicated to Mr. Perkins, and Mr. Perkins

---

[1] 76 Mo. 660.

communicated to his attorney, Mr. Butterfield, was not in dispute. Upon the proceedings to dissolve the attachment, it was incumbent upon the plaintiffs in the writ (Perkins & Richmond) to show actual cause for suing out the writ. It was obligatory upon them to show that the allegations in the affidavit were literally true. On the other hand, in the present suit for malicious prosecution of the writ, a complete defense is established by showing probable cause; or, in other words, the burden is upon the plaintiff in this suit (he who was the defendant in the writ of attachment) to establish both want of probable cause and malice, to make his case, though malice may be inferred from want of probable cause. It is generally stated in all cases upon this subject that malice and want of probable cause must coexist, to found an action for malicious prosecution, although malice need not be directly and affirmatively proved, but may be inferred from want of probable cause. Where the facts are undisputed, probable cause is a question of law, to be determined by the court upon the facts of the case. *Israel v. Brooks,* 23 Ill. 575; *Cloon v. Gerry,* 13 Gray, 201. But if the facts are in dispute, so that the question of probable cause becomes a mixed one of law and fact, it must be given to the jury to determine, upon proper instruction from the court. *Humphries v. Parker,* 52 Me. 502; *Heyne v. Blair,* 62 N. Y. 19; *Cole v. Curtis,* 16 Minn. 182. In this State the rule has been adopted that where one places all the facts before his counsel, and acts upon his opinion, proof of the fact makes a case of probable cause, provided the disclosure appears to have been full and fair, and no material facts withheld. In support of the text in Cooley on Torts, recited in the circuit judge's charge, the author cites *Ravenga v. Mackintosh,* 2 Barn. & C. 693; *Stone v. Swift,* 4 Pick. 389; *Walter v. Sample,* 25 Penn. St. 275,—and a long list of

other cases. In the last case cited (*Walter v. Sample*), it was said:

"If a prosecutor has fairly submitted to his counsel all the facts that he knows are capable of proof, and has acted *bona fide* on the advice given, he negatives, if not the malice, the want of probable cause, and is not liable to an action for malicious prosecution, even though the facts did not clearly warrant the advice and prosecution."

It is also held that advice of counsel may also disprove malice. In *Stanton v. Hart*, 27 Mich. 539, 542, Mr. Justice CAMPBELL says:

"Every man of common information is presumed to know that it is not safe, in matters of importance, to trust to the legal opinions of any but recognized lawyers. * * * When a person resorts to the best means in his power for information, it will be such a proof of honesty as would disprove malice, and operate as a defense, proportionate to his diligence."

In *Perry v. Sulier*, 92 Mich. 75, it was said:

"The person seeking and receiving such advice is in law as well as in morals justified in acting upon it, provided that he fully and fairly state the facts to the attorney."

The following cases are in accord with our own decisions in which advice of counsel has been held to constitute either probable cause or absence of malice in the prosecution of civil proceedings. *Brewer v. Jacobs*, 22 Fed. Rep. 222; *Emerson v. Cochran*, 111 Penn. St. 619; *Allen v. Codman*, 139 Mass. 136; *Lemay v. Williams*, 32 Ark. 166.

It is contended that the allowance of Miss Sherman's testimony as to her knowledge of plaintiff's business and financial affairs and his efforts to borrow money, and the inclusion of those elements in the charge to the jury, as part of what was claimed by the defendants to justify the attachment, was error. We think there was no error in this. The gist of the action is want of probable cause and

malice, and whatever had a tendency to rebut malice and show probable cause was competent; and Miss Sherman's testimony was competent and admissible, as bearing upon both questions, and to enable the jury to say whether the defendants did more than "what careful and prudent business men would have done under like circumstances." *Brand v. Hinchman,* 68 Mich. 601.

It is also claimed that the court erred in charging that both want of probable cause and malice must concur, to entitle the plaintiff to recover. This has already been discussed, and the doctrine is too well settled to need any further discussion, that the charge was correct. The authorities are uniform upon the subject, and sustain the charge as given. See the authorities collected in 14 Amer. & Eng. Enc. Law, p. 46 *et seq.;* also cases cited in note to *Sharpe v. Johnstone, supra.*

Some other errors are claimed, but after a careful examination of them, and the authorities bearing upon the subjects discussed in brief of plaintiff's counsel, we do not think them of sufficient importance to need discussion here.

Judgment is affirmed.

The other Justices concurred.