KOMPASS v. LIGHT.

1. MALICIOUS PROSECUTION—ATTACHMENT—ADVICE OF COUNSEL— PROBABLE CAUSE.

Proof that defendant in an action for malicious prosecution of a writ of attachment acted upon the advice of counsel, given after a full and fair statement of all the material facts known to defendant, establishes probable cause, even though the advice given was not warranted by the facts disclosed to the attorney.

2. SAME—QUESTIONS FOR COURT.

The question of probable cause for suing out a writ of attachment is one of law for the court, where the facts are undisputed.

3. ATTACHMENT—EXCESSIVE LEVY.

The fact that property seized on attachment for a debt of $1,150 was inventoried at $4,400 does not show that the levy was so excessive as to defeat plaintiff's rights under the writ.

Error to Berrien; Coolidge, J. Submitted October 24, 1899. Decided December 2, 1899.

Case by Rudolph F. Kompass and Matthew Stoll, copartners as Kompass & Stoll, against William Light, for malicious prosecution of a writ of attachment. From a judgment for defendant, plaintiffs bring error. Reversed.

*Marshall L. Howell* and *Edward Bacon*, for appellants.

*O'Hara & O'Hara*, for appellee.

LONG, J.  Plaintiffs commenced business in Niles in 1895, as manufacturers of tables.  They constructed a factory and bought machinery.  It appears that a considerable loan of money was necessary with which to commence business.  They gave a mortgage on the real estate to Reddick & Johnson for $7,800, payable in monthly installments of $50.  In 1897 the firm became largely indebted.  It owed the bank at Niles something over $7,000, and also owed the defendant $1,150.  It gave the bank a chattel mortgage for the amount of its claim. This mortgage was given December 9, 1897.  On January 15th following, the defendant sued out a writ of attachment against the plaintiffs in the circuit court of that county, stating in his affidavit for the writ that "he has good reason to believe, and does believe, that the said defendants have assigned, disposed of, and concealed their property with intent to defraud their creditors." The writ was placed in the hands of the sheriff, and he at once took possession of all the property in and around the mill, which property was inventoried at the sum of $4,401.60.  The sheriff, also, under the direction of the attorney for the plaintiff in the writ, closed the mill, and held possession of the property until February 1st following.  The plaintiffs here were at that time employing some 25 or 30 men, and apparently doing quite a large business.  The plaintiffs here commenced proceedings before the circuit court for a dissolution of the attachment, and on February 1st the attachment was dissolved, and the plaintiffs restored to possession.  The present suit was then commenced to recover damages which plaintiffs claim resulted from the malicious and wrongful suing out of the writ of attachment.  The case was tried before a jury.  Verdict was returned in favor of defendant, and plaintiffs bring error.

The defense was that there was probable cause for the suing out of the writ, that there was no malice, and that defendant relied upon the advice of his counsel.

The court charged the jury upon these questions as follows:

"If he [defendant] has no cause of action, and knows it, or believes he has none, or has no good reason to believe he has any, he is liable in this form of action; but if he has reason to believe that a fraudulent conveyance has been made by the debtors, or that they have concealed their property fraudulently, and in good faith causes a writ of attachment to issue upon those grounds, and because he believes that a fraud has been perpetrated, then he is protected from liability. In such cases probable cause exists. He cannot act upon every surmise or conjecture, unwarranted by any facts or information. He must have such facts and information before him as lead men of ordinary prudence, under like conditions, to believe that a fraud has been committed. It is claimed in this case by the defendant that he is protected from liability on account of the advice of counsel. The general rule is, if a client in good faith states all the facts which he knows or could have learned by reasonable diligence to his attorney, and his attorney then informs him he has a cause of action, and he after that acts upon such advice, he is protected from liability by reason of such advice. The facts communicated must bear upon the remedy adopted. In this case it is claimed by the defendant that he proceeded upon the ground that the chattel mortgage to the bank was void, and the plaintiffs had fraudulently concealed their property. If he stated all the facts to his attorney bearing upon these issues, and the attorney thereupon advised him he had a cause of action, he would be protected, if he acted in good faith. If, however, attachment proceedings were instituted, not because he had good reason to believe the chattel mortgage was void, but as a mere expedient to collect a debt when he knew he had no ground to base an affidavit of attachment upon, then he would be liable. If the attachment proceedings arose from a mere arrangement between the attorney and client for the purpose of collecting a debt, when they both understood that they had no ground for suing out the attachment, the client would still be liable. The client has a duty to perform as well as the attorney. He must act in good faith, and with a belief, not merely that an attachment is the remedy, but the proper and lawful one. If he has disclosed the facts, and the attorney then tells him that such facts furnish sufficient ground for him to make the affidavit, and the client relies in good faith upon this advice, and makes the affidavit, he will be

protected. It is contended by the defendant that such is the fact. It is contended by plaintiffs that the defendant did not state any facts authorizing, or tending to authorize, the making of the affidavit for attachment, and the attachment was instituted, not because there was any lawful ground for it, but simply as an experiment, without lawful ground, to enforce the payment of the defendant's claim. This is a matter of fact for you to determine.

"It is also claimed that the act of the defendant in suing out the attachment was reckless and negligent. If this be so, the defendant is liable, even though the attorney may have advised him to commence attachment proceedings. A mere direction by the attorney to commence an attachment is not sufficient alone to protect the client from liability. It must be advice that the attachment proceeding is proper and authorized, upon the facts stated by the client to counsel, or upon facts known by both, or advice that the client has good reason for instituting the attachment. The attorney, however, may be mistaken in giving his opinion,—that is, he may be mistaken as a matter of law,—and yet, if the attorney gives his advice in good faith to his client, the client would have a right to rely upon it even though the attorney was mistaken. If the attorney informed his client, after a full statement of the facts, that an attachment proceeding is proper and lawful, and the client himself acts in good faith and relies upon the advice, he is protected. A client cannot act, however, upon mere suspicion or conjecture alone. He must exercise that prudence which men of ordinary prudence would use under like conditions. Then the law will protect him. If he acts carelessly and recklessly, he is liable for the consequences of his wrongdoing. Attorneys sometimes advise clients to commence attachment proceedings, not because there is lawful ground for it, but as an expedient for forcing the payment of a debt. In such cases they inform their clients very often, although they have no good ground for attachment, that they stand a good chance of collecting their debt in this way. In such cases the client takes his chances. He is liable for damages if he causes property to be seized under such circumstances. Of course, in this case, the defendant denies that any such circumstances exist, while the plaintiffs claim that they do exist.

"There are two main questions before you: *First*, whether there was probable cause for the issuing of this

attachment; *second*, whether the advice was given by counsel under such circumstances that it furnished a protection to the defendant in this case. Those are the two main questions. So far as the question of the unlawfulness of this attachment proceeding, that has been determined by the proper tribunal having jurisdiction in the matter. That tribunal decided that the attachment itself was unlawful, and no cause existed for it. So there is nothing upon that question for you to act upon. You are simply to act upon the question whether there was probable cause for getting out the attachment, and whether the defendant acted upon legal advice, under circumstances that justified him."

Counsel for plaintiffs asked the court to charge:

1. That plaintiffs are entitled to recover, and the only question for determination is the amount of the verdict.

2. That the advice of defendant's counsel was not given upon such a state of facts as makes it a protection to the defendant.

3. That the levy was excessive to such an extent as to make the defendant liable.

4. That the writ of attachment dated January 15, 1898, was illegal, and was adjudicated to have been issued without any valid cause whatever.

These requests were refused, except the last, which was given in the general charge. The main contention in the case arises out of the first and second requests to charge.

The facts testified to by the defendant, and upon which he claims to have acted, are that Kompass & Stoll owed him $1,150; that he had dealt with them for several years, and had been in the habit of taking their notes for lumber sold them, and discounting them at the bank, where they would be paid by Kompass & Stoll when due; that, as to this claim of $1,150, he tried to get a note from Kompass & Stoll, but, before doing this, he went to the cashier of the bank, and was informed by him that, if the books of Kompass & Stoll showed that they were doing as well as they thought or claimed, the bank would take the note if he got it; that, not getting the note, he delayed a week, and then found that Kompass & Stoll had given the

chattel mortgage to the bank for $7,660.72, covering the whole of their personal property. This mortgage was given December 9, 1897. Defendant also testified that, on December 23d following, he received a circular letter from Kompass & Stoll, as follows:

"NILES, MICH., Dec. 23, 1897.

"*Dear Sir:* It is unnecessary for us to say that the past two and a half years that we have been in business at Niles have been hard years for small manufacturers of furniture. We have worked hard and practiced the strictest economy, but the pinch lasted too long, and the First National Bank of Niles, which has carried us since we started in business, compelled us to secure them by chattel mortgage, December 9, 1897. The debt amounted to $7,660.72. We also owe a mortgage of $7,800 on our plant, put on in July, 1895, to raise money for its construction. On this we have 13 years' time from July, 1895, in monthly payments. There is balance due on same of $7,100. If bank forecloses their chattel mortgage, we are satisfied the assets will not bring enough on forced sale to pay the mortgage. We have friends who will give assistance to enable us to go ahead and finish up stock on hand, and we believe we can save a thousand dollars out of it for creditors, and continue the business. This assistance we can only get on condition we can compromise our debts and save the business. Our unsecured indebtedness is $7,091.72, and we figure we can pay 15 cents on the dollar if we get the assistance. We send this statement to each of our creditors, and, if the same is accepted by all before the 15th day of January next, we will pay the 15 per cent. on or before February 1, 1898. We are willing any creditor or committee of creditors come here and investigate our affairs. If this offer is accepted, please sign and return inclosed sheet, filling in amount of your claim.

"Yours,

"KOMPASS & STOLL."

Defendant also testified that he had heard that a man by the name of Imhoff was intending to bring replevin for some lumber; that he (defendant) then procured a copy of the chattel mortgage given to the bank, and took it to his attorney. On defendant's direct examination, he testified, in response to a question asked him by his attorney:

" I left the whole thing to you; didn't make any plan; it was your plan. * * *

" *Q.* I told you to sign that affidavit?

" *A.* Yes, sir. * * *

" *Q.* You did that because I told you to?

" *A.* Yes, sir."

On cross-examination defendant testified that he authorized and ratified everything his attorney did.

The attorney for defendant testified:

"I was kept advised from time to time by telephone by Mr. Ferguson, the sheriff, as to what was going on. Whatever Mr. Ferguson did at Niles he did under my instructions. * * * It was by my authority that the factory was shut up and kept shut. I didn't order the attachment of $4,000 worth of stuff. It was to take it all, every single thing there, except exemptions; take every other thing he could find there, without regard to the value of it, to compel the payment of the debt. I had a homely idea that possibly they might pay; if they didn't pay, they would resort to replevin. I thought of the question of the dissolution of the attachment. I thought it would go through the ordinary way; the circuit judge would have other business than to sit and try the case as commissioner. Inasmuch as there was a circuit court commissioner at Niles, it would be before the circuit court commissioner, and, if it was adverse, we could appeal to a jury of Berrien county, so we could hold the attachment on the property. My idea was to get the money. I don't know whether I said at Niles that, if it was brought before a commissioner, we would have held it there until we got our judgment; I would have done so, whether I told you so or not. I didn't believe there would be any proceedings to dissolve the attachment. I thought, if the money wasn't paid, the remedy would be replevin by the bank, because I made up my mind, if the bank insisted that the mortgage was a good mortgage, they would have the manhood to assert it in a court of law. Mr. Light was able to pay the damages. We were unable to show by a fair preponderance of the evidence, to the satisfaction of the court, that the mortgage was fraudulent. The burden of proof was upon us. In a replevin suit the burden was upon the other fellow to show it was good; that is what I figured on; if the evidence was equally balanced, we would win."

The defendant also testified that he thought if he took everything plaintiffs would settle up.  He further stated that his attorney told him to hurry up, and get there before Imhoff could bring replevin.  The only reason given by defendant or his attorney for believing that the mortgage to the bank was fraudulent was because it was too large for the amount of the indebtedness.  No proof was made in the case that the mortgage was not given for the actual amount of the indebtedness, and neither of these witnesses testifies to any fact or circumstance which came to his attention before the attachment was issued which in the slightest degree had a tendency to show that the mortgage was fraudulent.  It appears that they made no inquiry about it, saw none of the officers of the bank, and made no inquiry of Kompass & Stoll.  The only reasons given by the attorney for thinking the mortgage was fraudulent were the following:

"It was not the Imhoff matter alone that made me think the mortgage was fraudulent.  Taking the mortgage and the letter [the letter written by plaintiffs to defendant, above set forth], and the other mortgage, and the fact that Johnson held the other mortgage for $7,800, to be paid $50 per month, without interest, and there ought to have been paid on it something like $1,300, and only $700 paid on it, according to their letter.  From my understanding of the law, the bank could not hold real-estate security.  The title to that first mortgage was actually in the bank; that is, the loan was made by the bank, and the mortgage was actually the bank's.  I thought the bank would bring replevin."

It appeared that the title to this first mortgage was in Mr. Johnson, and not in the bank.  There was no claim but that this real-estate mortgage was *bona fide.*

There is no evidence in this record tending to show probable cause for issuing the writ of attachment.  Where the facts are undisputed, probable cause is a question of law, to be determined by the court upon the facts of the case.  *Le Clear* v. *Perkins,* 103 Mich. 131 (26 L. R. A. 627); *Israel* v. *Brooks,* 23 Ill. 575; *Cloon* v. *Gerry,* 13 Gray, 201.

But it is contended by counsel that, the defendant having fully and fairly placed all the facts before his counsel, and acted upon his opinion, probable cause is established. It is the rule that where one places all the facts before his counsel, and acts upon his opinion, proof of the fact makes a case of probable cause, provided the disclosure appears to have been full and fair, and no material facts are withheld; and this may also disprove malice. *Stanton* v. *Hart,* 27 Mich. 539; *Perry* v.. *Sulier,* 92 Mich. 75. There is nothing in the present case showing, or tending to show, that the defendant did not place all the facts within his knowledge before counsel; and, under the well-settled rule in this State, the advice given to him by his counsel is a sufficient showing of probable cause.

It is contended, however, by counsel for plaintiffs, that the advice of counsel cannot protect unless it is founded upon facts tending to justify the advice. If this were the rule, we would be led to the conclusion that the facts stated to the attorney did not justify the advice given, and the case should be reversed. But the rule is not limited to that extent. The advice may not be justified by the facts stated, yet if the party takes the advice of counsel after statement is fully made, and acts upon such advice, probable cause is established. That question was very fully and fairly left to the jury under the charge as given.

But, as we have said, the facts upon which the defendant claims to have relied as a justification for suing out the writ do not establish probable cause. The court was therefore in error in leaving that question to the jury. We are unable to say that the jury did not rely upon that part of the charge in finding the verdict they did, rather than upon the fact that the defendant relied upon advice of counsel.

The court properly refused to give the first and second requests to charge. In effect, the court did give the fourth request. We think the third request should not have been given, as there was no such excessive levy, as claimed, as could affect the defendant's rights under the writ.

For the error pointed out, however, the judgment must be reversed, and a new trial granted.

MONTGOMERY, HOOKER, and MOORE, JJ., concurred with LONG, J.

GRANT, C. J.   I concur in the conclusion reached by my Brother LONG.   I am, however, of the opinion that there was no question of fact for the determination of the jury, except the amount of damages sustained by the plaintiffs.   Neither the defendant nor his attorney had any facts before them sufficient to justify either in making an affidavit that he had good reason to believe, and did believe, that the plaintiffs had assigned, disposed of, and concealed their property with intent to defraud their creditors.   The debts secured by the mortgages given by plaintiffs were *bona fide,* and neither defendant nor his attorney made any investigation or showed any reason for believing otherwise.   Defendant did not testify that his attorney told him that the facts placed before him were sufficient to justify him in making the affidavit.   It would be a reflection upon the intelligence of the attorney if he had done so.   In reply to the question by the court, defendant testified:

"I told Mr. O'Hara— I says: 'I don't want to make a botch thing out of this.   If you don't think this thing will work, we will not go ahead at all;  I will not run the risk.'   You talked very favorable that this was all right. I left the whole thing to you; didn't make any plan; it was your plan."

On cross-examination, he testified as follows:

"Q.  All you told him up to that time was that there was two mortgages, and they owed you, and they hadn't paid you.   He told you to go and get a copy of the chattel mortgage, didn't he?
"A.  Yes, sir.
"Q.  He gave you no advice at all, did he?
"A.  Gave me what?
"Q.  Gave you no advice at all?
"A.  Not the first day.

"*Q.* The next day you saw him was the 15th, wasn't it?

"*A.* I think so; yes, sir.

"*Q.* What did you tell him on the 15th?

"*A.* I didn't tell him anything; he done the talking himself.

"*Q.* What did he say?

"*A.* Told me the best thing was to get out a writ, and shut the shop down.

"*Q.* Had you told him anything else between the 6th and the 15th?

"*A.* Not as I know of.

"*Q.* He said the best thing to do was to get out a writ, and shut up the shop?

"*A.* Yes, sir.

"*Q.* What else did he say?

"*A.* I don't know.

"*Q.* Did he say anything else?

"*A.* Not as I know of."

Defendant further told his attorney that he believed Mr. Kompass to be an honest man. It follows that defendant did not believe him guilty of any intent to defraud his creditors. When two defendants are jointly charged with the fraudulent disposition of their property, the attachment cannot be sustained unless fraudulent action is shown on the part of both. *Cottrell* v. *Hatheway,* 108 Mich. 619, and authorities cited. I think the record conclusively establishes that both defendant and his attorney sought to force the payment of his claim by seizing all the property of the plaintiffs, shown to be nearly four times the amount of his claim, and by closing up their business, and that neither had any facts before them sufficient to justify any reasonable person in forming a belief that plaintiffs were guilty of fraud.