# Joseph R. T. Coates *v.* John A. Wallace and William C. Sproul, Appellants.

*Libel—Privileged communication—Burden of proof.*

A communication to be privileged, must be made on a proper occasion, from a proper motive and be based upon reasonable or probable cause. The immunity of a privileged communication is an exception, and he who relies upon an exception must prove all the facts necessary to bring himself within it.

*Libel—Probable cause defined.*

Probable cause, which will sustain a privileged communication, is a reasonable ground of suspicion supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offense.

Knowledge that the plaintiff had neglected to perform certain duties, such as the collection of certain fees, affords no probable or reasonable ground for belief in the charge that he had violated the law by receiving fees to which he was not entitled, especially when the fees referred to in the charge were the same fees which he was known not to have received.

*Libel—Duty to prove truth or establish probable cause.*

A charge that a candidate " did violate the law and take fees to which he was not entitled " is libelous per se. The plaintiff at the time being a candidate for a public office it was made on a proper occasion and from a proper motive, but responsibility will not be excused where the defendant not only fails to show the truth of the statement but also to establish that it was based on reasonable or probable cause. It is not sufficient to show that defendant had information which led him to believe it was true, the circumstances leading to the belief must be shown, that it may appear whether or not it was well founded.

*Evidence—Erroneous rejection cured by cross-examination.*

The appellate court will not reverse for error in rejecting competent testimony where the record shows that the very matters to which the offers relate were subsequently brought out in full by the subsequent cross-examination of the witnesses by whom the offer had been made to prove the rejected testimony in chief.

254　　　COATES *v.* WALLACE et al., Appellants.

Statement of Facts—Assignment of Errors.　　[4 Pa. Superior Ct.

Argued Nov. 17, 1896. Appeal, No. 38, Nov. T., 1896, by defendant, from judgment of C. P. Delaware Co., Sept. T., 1894, No. 125, on verdict for plaintiff. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed.

Trespass for alleged libelous publication.

The facts sufficiently appear in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $500. Defendants appealed.

*Errors assigned* among others were (6) in overruling the defendants' offer to prove the sources of the information from which William E. Tribit, the city editor, who inserted the article in the newspaper, derived his information of the truth of the article, as follows : (William E. Tribit, the witness on the stand :)

Mr. Robinson : " I propose to prove the statement to the witness by the city controller, for the purpose of showing probable cause for believing the statement to be well-founded."

Objected to. Objection sustained.

Mr. Robinson : " I also desire to offer and propose to prove the statement heard by witnesses in public debates of council while it was in session, for the purpose of establishing probable cause for believing that there was a foundation for the statement made in the article."

Objected to. Objection sustained. Exception for defendants.

(7) In sustaining the objection to the testimony of the witness Hawthorne, who was the city controller, that he had given information to William E. Tribit, the city editor, tending to confirm the truth of the allegation in the article complained of as follows : (J. L. Hawthorne, city controller, on witness stand :)

" Q. What was the conversation about (with Mr. Tribit)? What was the subject of the conversation ? A. It was in regard to fees. Q. In regard to what fees ? A. The fees that the mayor should have turned into the city. Q. Did you go over the books and the figures in them in that connection ? A. I did, yes. Q. What was the conversation."

Objected to. Objection sustained. Exception for defendants.

"Q. Was there any talk in the community about the mayor and in regard to his fees at that time?"

· Objected to. Objection sustained.

"Q. What was said by the members of council in public session of council on this subject?"

Objected to. Objection sustained. Exception for defendants.

"Q. What was the result of your investigation in regard to this condition of affairs which you describe involving the mayor 'and his fees?'"

Objected to. Objection sustained. Exception for defendants.

(9) In overruling the question addressed to Hon. John B. Robinson, the author of the article complained of, as to his information regarding the statement in reference to ex-mayor Coates, as follows: (John B. Robinson, a witness, on the stand:)

"I have asked you whether you had any information upon the subject of the statement made in reference to ex-mayor Coates."

The Court: "Q. Had you information which led you to believe it was true? A. Yes, I had. Q. What was the information?"

Objected to. Objection sustained. Exception for defendants.

(10) In overruling the defendants' offer of testimony, as follows: (George Weigand, a member of city council, on the witness stand:)

Mr. Lindsay: "I offer to prove the language used in the debates and discussions that took place in council upon the subject of the mayor and his fees."

Objected to. Objection sustained. Exception for defendants.

(11) In overruling the defendants' question as follows: (George Weigand, a member of council, on the stand:)

"Q. Do you know of any public criticism that the mayor was taking fees or money, and not turning them over to the city treasurer?"

Objected to. Objection sustained. Exception for defendants.

(12) In overruling the defendants' proposal as follows:

Mr. Lindsay: "Having proved that the city editor was in attendance upon the public session of select council at the time that the subject of Mayor Coates and his fees was under discussion before them, I now offer to prove what the language of that discussion was by a member of council who was present at that time and who participated in it.

(13) In overruling the offer to prove by Thomas B. Taylor, a reporter on the Times, that he had investigated the charges against the mayor, and reported that they were true to Mr. Tribit, as follows: (Thomas B. Taylor, a reporter of the Times, on the stand:)

" Did Mr. Hawthorne, the city controller, make a statement to you about the receipt of fees by the mayor? What was said by Hawthorne about it?"

Objected to. Objections sustained. Exception for defendants.

" Mr. Taylor, had you any reason to believe at the time this article was given to Mr. Tribit for publication that the fact therein contained against the mayor was not true?"

Objected to. Objections sustained. Exception for defendants.

"Had you at that time any reason to believe that it was true?"

Objected to. Objections sustained. Exception for defendants.

*Geo. B. Lindsay* and *V. Gilpin Robinson*, for appellants.— This case turns upon the question whether the article published is a privileged communication, and the ruling of the court below is in direct conflict with Briggs v. Garrett, 111 Pa. 404; Jackson v. Pittsburg Times, 152 Pa. 406, and with the understanding of the profession as to what is the law upon the subject.

What is probable cause is defined in Smith v. Ege, 52 Pa. 419, which is affirmed in McCarthy v. DeArmit, 99 Pa. 69, and Gilliford v. Windel, 108 Pa. 142.

A privileged communication is such as one man may make to another without responsibility, where he acts in good faith: Press Co. v. Stewart, 119 Pa. 584; Brett v. Watson, 20 Weekly Rep. 723.

*W. B. Broomall*, for appellee.—Where the charge is an indict-

able offense the presumption of innocence in itself is a fact from which the prima facie inference of want of probable cause flows : Conroy v. Pittsburg Times, 139 Pa. 334.

The inquiry as to the probable cause goes back to the commencement of the prosecution, and it relates to the facts then known and as they then appeared : Grohmann v. Kirschman, 168 Pa. 189.

" A newspaper proprietor is liable for the republication of a libel published in another paper : 13 Am. & Eng. Ency. of Law, 318.

OPINION BY SMITH, J., April 12, 1897 :

A newspaper article, published first in the Media Ledger, and reprinted in the Chester Times, a newspaper published by the defendants, contained the following passage concerning the plaintiff : " Ex-mayor Coates, his opponent, when mayor of the city of Chester, did violate the law and take fees to which he was not entitled." Mr. Coates, contending that this statement was false and libelous, brought this action. The defense is that the publication is privileged.

The essentials of a privileged communication are well settled. " A communication, to be privileged, must be made on a proper occasion, from a proper motive, and based upon reasonable or probable cause : " Briggs v. Garrett, 111 Pa. 404 ; Jackson v. Times, 152 Pa. 416. " The immunity of a privileged communication is an exception. The general rule is that nothing but proof of its truth is a defense of a libel. That it was privileged, because published on a proper occasion, from a proper motive, and upon probable cause, is the excepted case, and he who relies on an exception must prove all the facts necessary to bring himself within it : " Conroy v. Times, 139 Pa. 334 ; MITCHELL, J. The probable cause which will give this privilege is thus comprehensively defined in Munns v. Dupont, 3 Wash. C. C. Rep. 31 : " A reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offense." This is quoted with approval in Winebiddle v. Porterfield, 9 Pa. 137 ; COULTER, J.; Chapman v. Calder, 14 Pa. 365 ; ROGERS, J.; Smith v. Ege, 52 Pa. 419 ; STRONG, J. " Where the public conduct of a public man is open to animadversion, and the writer who is commenting upon it

makes imputations upon his motives which arise fairly and legitimately out of his conduct so that a jury shall say that the criticism is not only honest but well founded, the action is not maintainable. If a public writer fancies that the conduct of a public man is open to the suspicion of dishonesty, he is not therefore justified in assailing his character as dishonest, or charging him with a criminal offense: " Campbell v. Spottiswoode, 3 Best & S. 769, quoted by TRUNKEY, J., in Neeb v. Hope, 111 Pa. 145.

It cannot be doubted that the publication in the present case was libelous per se. There is as little doubt that it was made on a proper occasion and from a proper motive, the plaintiff at the time being a candidate for a public office. The only question to be further considered is whether it was based on reasonable or probable cause for believing it true. That the defendants believed it to be true, is not sufficient; the belief must have rested on reasonable and probable cause : Winebiddle v. Porterfield, supra.

Personally, the defendants took no part in the publication complained of, and they had no knowledge of it until after it had been made. The person by whom it was directed was Mr. Tribit, the city editor of the Chester Times. It is contended, on the part of the defendants, that Mr. Tribit had knowledge of facts on which it was based which furnished probable cause for believing it true. In our view of the case, the only assignments of error which it is necessary to consider are those relating to the rejection of evidence offered by the defendant respecting the sources from which Mr. Tribit derived his information, and its character.

The ninth assignment cannot be sustained. It is not sufficient that Mr. Robinson, who published the article in the Media Ledger, "had information which led him to believe it was true." The circumstances leading to his belief must be shown, that it may appear whether or not it was well founded. Even if the defense here could be based on circumstances known to Mr. Robinson, not communicated to the defendants, the offer falls short of the essential requisites. The offers embraced in the tenth, eleventh and twelfth assignments are too vague, and relate to matters collateral to the alleged source of information, wholly immaterial. As to the thirteenth, the offer does not propose to show that any information obtained by the witness

was communicated to the defendants or to Mr. Tribit previous to the publication ; and whether the witness had any reason to believe that it was not true is immaterial. These assignments, it may be added, are defective under the rule in embracing more than one point, and even if meritorious we should be justified in disregarding them. This leaves only the sixth and seventh assignments for consideration. In strictness, we might well disregard these, as each violates the rule in embracing more than one point. But on questions involving a matter so important as the freedom of the press, we waive this objection and proceed to examine them.

The defendants had an undoubted right to prove the circumstances on which probable cause for belief was based, with the sources of their information so far as the latter bore on the good faith of their inquiry: Conroy v. Times, 139 Pa. 334; Jackson v. Times, 152 Pa. 406. If the record showed no more on this subject than the offers embraced in these assignments, we should be constrained to regard their rejection as error. But the record shows a great deal more. It shows that the very matters to which the offers relate were subsequently brought out in full by the cross-examination of Mr. Tribit and ex-city controller Hawthorne, the witnesses by whom the defendants offered to prove them. This cured the error of rejecting the offers. It further shows that on the point of probable cause the defense was wholly without foundation. As the information on which the publication was based was thus presented as fully as if on direct examination, and as it constituted no defense, the defendants were not prejudiced by the rejection of the offers.

That it may fully appear what the defendants proposed to show, as probable cause, we give the statement of it presented by their counsel during trial, viz :

" Mr. Robinson : The foundation of this article was the following state of facts : The city had been paying to the mayor five hundred dollars a year as a salary, and he had been receiving also all the fees which were derived from his office. The city had also been permitting the chief of police and the officers to take all the fees to which they were entitled, which would probably amount to another thousand dollars. The act of 1889 changed the law for the benefit of the city. It provided that hereafter the mayor and the officers of the city should have a

fixed salary, and that the fees pertaining to the office should be turned into the city treasury.   Our evidence is, as I understand it, that immediately after the election of the mayor and before he took his seat the question of the amount of the mayor's salary had to be fixed, and an ordinance was passed fixing the amount of the mayor's salary at fifteen hundred dollars a year. This amount of salary being granted to him on the distinct understanding that the mayor should turn the fees received by the city into the city treasury.   He took his position as alleged on the first Monday of April, and shortly afterward, through some arrangement between alderman Allen and the mayor, as we assume, the mayor ceased to hear the cases which had been formerly heard by him, and alderman Allen was brought into the city hall and placed in the seat of the mayor, and from that time hearing the cases which previously were all heard by the mayor, and alderman Allen took the fees which had previously been received by the mayor, and which ought to have been turned into the city treasury.   That was a subject of discussion for a long time.   The chief of police likewise continued to take other fees.   Under the act of 1889 it was the duty of the mayor to collect the fees and pay them into the treasury.   The matter was discussed in council and finally it ended in litigation to ascertain why the money did not go into the public treasury and to compel it to be paid, and this subject then became an issue in the courts.   Now it is that state of facts, the fact that the city treasury of the city of Chester was deprived of two thousand dollars, which is the basis of this criticism.   And following it further we will show that the city, in order to require him to turn in his fees, through their counsel, for the purpose of compelling the mayor to do so, refused to fix the salary of the committing magistrate in order to compel this to be done, and that was a matter of criticism and of discussion in council.   Now this article says : ' Ex-mayor Coates, while mayor of Chester, violated the law and took fees to which he was not entitled.'   It was his duty to collect the fees from the officers ; it was his duty, I take it, to see that the fees that came from the committing magistrate be turned into the city treasury.   That he did not do.   But we have the right to presume that he did his duty and show the fact that during the time he was in office after the first Monday in April, 1890, no

fees were turned into the city, either through the officers through whom it was his duty to collect or likewise through the committing magistrate that performed his duty. We have the right to assume that he collected these fees, and if they were paid over that they went into his pocket. What took place between him and the committing magistrate or what took place between him and the officers of the city we cannot know; we can only show the fact by giving the circumstances leading up to that, that it was his duty to collect and pay over these two thousand dollars into the city treasury and that it didn't get there. In other words, that the city did not get some two thousand dollars worth of fees which it was legally entitled to receive, and the mayor got one thousand dollars more than he was entitled to by reason of it."

From the cross-examination of the plaintiff it appeared that for the first two years of his second term, 1890 and 1891, the hearings were at his request held regularly by alderman Allen, a committing magistrate appointed under a city ordinance, the mayor hearing only exceptional cases; that in 1892, the select council having refused to confirm the reappointment of the magistrate, the hearings were held by the mayor and the fees received by him were paid to the city treasurer.

From the testimony of Mr. Hawthorne and Mr. Tribit, it appears that the former, while city controller, made an investigation respecting the fees in question, which he reported to the city councils, and that he also informed Mr. Tribit of its result, and showed him the entries or papers on which it was based. The result of this investigation, and the information thus given to Mr. Tribit, was, not that Mr. Coates had received fees to which he was not entitled, or had retained fees which he should have paid into the city treasury, but that he had failed to hear cases which, in the opinion of Messrs. Hawthorne and Tribit, he should have heard, and to collect fees which in their opinion he should have collected and paid into the city treasury. It was this that Mr. Hawthorne reported to the city councils, with a statement of the amount of fees involved. His testimony shows clearly that he was unable to discover that the mayor had received fees which he should not have received, or had failed to pay into the treasury fees which belonged to the city. And Mr. Tribit, in answer to the question, " Whether, outside

of those papers (shown by Hawthorne to Tribit) Mr. Hawthorne has ever mentioned to you the fact or circumstance of mayor Coates ever having taken a fee contrary to law," replied, "Well, I don't know that he did." His further cross-examination shows that his information was in fact limited to the matters already related: "Q. Well, then, the whole sum and substance of it was that if the mayor had heard the cases the city would have been much richer and have that much more money? A. Yes, sir. Q. And that is the whole sum and substance of your knowledge? A. I believe so."

The defendant Wallace, who had received from the city controller substantially the same information obtained by Tribit, in answer to the question, "I want your recollection of what he (Hawthorne) said," replied, "that the mayor had not taken any fees, and that he had not turned them into the city treasury." Ques. "That the mayor had not taken any fees, and that he had not turned them into the city treasury?" Ans. "Yes." Again: "Will you turn to any part of it (the city controller's report) which says that mayor Coates received any improper fees, and did not turn them over?" Ans. No, sir; he does not say that Coates did, but the city officials." This defendant further testified repeatedly and "advisedly," that what the controller stated to him was practically the same as the matters stated in his report. "My interpretation of the language," said he, "is that it amounts to the same thing." What the report set forth has already been shown.

We may properly refer to the definition of probable cause given by GIBSON, C. J., in Seibert v. Price, 5 W. & S. 438, an action based on a malicious prosecution for perjury: "It is a deceptive appearance of guilt, arising from facts and circumstances misapprehended or misunderstood so far as to produce belief."

Here, however, there was no misunderstanding or misapprehension as to the facts or circumstances; there was no room for any and no allegation of any. The circumstances lay within a narrow compass, and from the testimony of Messrs. Tribit and Wallace were clearly understood by them. The utmost that can be alleged on this point is that their legal import and effect, in relation to the charge against the plaintiff, may have been misconceived. This, however, contributes nothing to the ground of belief.

The circumstances on which the publication in this case was founded cannot be recognized as of a character to create a reasonable ground of belief in its truth.　Prior publication by another does not of itself create probable cause for belief.　Knowledge that the plaintiff had neglected to perform certain duties which the defendants or their representative thought he should have performed, or to collect certain fees which they thought he should have collected, affords no probable or reasonable ground for belief in the charge that he had violated the law by receiving fees to which he was not entitled, especially when the fees referred to in this charge are the same fees which he is known not to have received.　Had the evidence indicated by the offers under consideration been given in chief, it could have availed the defendants nothing, since it would have become the duty of the court to rule, that it failed to show a reasonable ground for belief in the charge published by the defendants.

The record showing no error, the judgment is affirmed.