## Director General of Railroads v. Pottstown Steel Company.

*Railroads—Act of Congress of June 29, 1906 (Hepburn Act)—Duty to furnish cars—Demurrage.*

1. The Act of Congress of June 29, 1906 (Hepburn Act), 34 Stat. at L. 584, amending the act to regulate commerce, requires railroad companies to provide and furnish transportation to shippers on reasonable request therefor.

2. Where a shipper is bound by a contract to ship material to a consignee, the carrier is bound to furnish cars to the shipper upon reasonable request, and the consignee cannot refuse delivery, and by notifying the carrier of its intention to do so, relieve itself of demurrage charges according to the published tariff. If the shipper was not bound by contract to make shipment, the consignee should have notified the shipper not to ship and notified the carrier not to furnish cars.

*Practice, C. P.—Affidavit of defence—Right to file supplemental affidavit.*

3. The failure to aver in an affidavit of defence what is necessary to constitute a defence brings into operation the rule that what is not alleged in an affidavit of defence is taken not to exist.

4. The propriety of the court's granting an extension of time for the filing of a supplemental affidavit of defence depends upon a showing by the defendant that he has an available defence and an explanation of his failure to present it in the first instance.

*Assumpsit.* Rule for judgment for want of a sufficient affidavit of defence. C. P. Berks Co., Aug. T., 1922, No. 112.

*Cyrus G. Derr*, for plaintiff and rule.

*Jesse R. Evans* and *Thomas K. Leidy*, for defendant.

ENDLICH, P. J., May 7, 1923.—The plaintiff in this case filed and served a statement of claim, the substance of which is that the defendant company had entered into a written agreement with the plaintiff, then operating the Pennsylvania Railroad, wherein the defendant, with respect to all cars handled by the plaintiff for the defendant at Douglassville, Pa., agreed that the latter would observe certain terms and conditions of the average basis for settlement for detention of cars and make prompt payment of demurrage charges in accordance therewith; that under this agreement the plaintiff, in February, 1920, had handled for defendant twenty-nine cars laden with ashes, scrap-iron, lumber, etc., placing the same for unloading by defendant; that again, under the agreement referred to, it then became the duty of the defendant as to each of said cars to unload the same within forty-eight hours after notice of arrival, and for any delay in unloading beyond forty-eight hours to pay the plaintiff for each car $2 per day or fraction thereof for the first four days and $5 for each additional day, the defendant being entitled to a credit for every car released within the first twenty-four hours of the forty-eight hours; that as to twenty-eight of the twenty-nine cars the defendant delayed unloading within the four-day period 112 car days, thus becoming indebted to the plaintiff $224, and beyond the four-day period 591 car days, becoming indebted to the plaintiff $2955, or a total of $3179, with war tax of $95.37; that as to the remaining one of said twenty-nine cars the defendant unloaded it within the first twenty-four hours, thus becoming entitled to a credit of $2 and 6 cents war tax, making plaintiff's claim $3272.31, with interest.

The defendant in its affidavit of defence admits the making of the agreement. It does not in terms admit the handling of twenty-nine cars laden with

4 D. & C.

divers articles, or its duty to unload the same within forty-eight hours after notice of arrival, or a liability per day in default of unloading, but avers that on Dec. 30, 1919, plaintiff placed an embargo covering all carload freight consigned to defendant at Douglassville, because of extremely frigid weather and frozen condition of shipments, and notified defendant that no shipments would be accepted; that in spite of embargo and notice, on Dec. 31, 1919, plaintiff accepted for shipment three additional carloads of frozen material; that defendant immediately advised plaintiff, through its agents at Douglassville and at Pencoyd, of its inability because of weather conditions to unload the material, and was assured that the acceptance had been by inadvertence and that there would be no further acceptance; that, nevertheless, the plaintiff accepted, between Dec. 31, 1919, and March 18, 1920, when the embargo was lifted by plaintiff, twenty-six carload shipments; that each day after Dec. 30, 1919, when defendant received notice of shipments, defendant at once notified plaintiff's agent at Douglassville that shipments were being made in violation of embargo, that they could not be promptly unloaded because of frozen conditions, and that defendant would not be liable for demurrage charges; that defendant was absolved from liability for demurrage charges, and denies liability, both because of embargo and notices to plaintiff and because of plaintiff's car demurrage rules, especially Rule 8, which, so far as here pertinent, is as follows: "No demurrage charges shall be collected under these rules for detention of cars through causes named below. Demurrage charges assessed or collected under such conditions shall be promptly canceled or refunded by the carrier."

The causes referred to are—

"Section A.—Weather interference.

"1. When the condition of the weather during the prescribed free time is such as to make it impossible to employ men or teams in loading or unloading, or impossible to place freight in cars, or to move it from cars, without serious injury to the freight, the free time shall be extended until a total of forty-eight hours free from such weather interference shall have been allowed.

"2. When shipments are frozen while in transit so as to prevent unloading during the prescribed free time. This exemption shall not include shipments which are tendered to consignee in condition to unload. Under this rule, consignee will be required to make diligent effort to unload such shipments, and shall not be entitled to additional time unless within the prescribed free time he shall serve upon the carrier's agent a written statement that the lading was frozen upon arrival."

The Director General of Railroads lawfully operating this railroad was bound (qualified only by the exigencies of the United States Government at war, or other extraordinary circumstances, none of which are alleged by the affidavit of defence) to provide and furnish transportation to shippers upon reasonable request. It was the shipper's right to insist upon the performance of such duty, and any determination on the part of the Director General, either by embargo or otherwise, and whether with the consent of the defendant or without it, unjustifiably to deprive the shipper of this right was illegal, nor could there be any valid claim by the defence based upon the so-called embargo set forth in the affidavit of defence. The determination on the part of the Director General of Railroads not to accept any further shipments consigned to defendant left out of consideration entirely the consignor and the consignor's rights. A carrier is not bound by any agreement between a consignor and consignee in relation to goods consigned: Davis *v.* Boiler and Tank Co., 276 Pa. 71, 79. Yet obviously a carrier cannot depart from a duty

imposed upon it, to the injury of a consignor, without incurring some responsibility towards the same. As observed in Souder v. Morrow, 33 Pa. 83, 84: "There is some merit in obeying the law of the land, and some danger incurred by not doing it."

The original Act of Congress to regulate commerce (Act of Feb. 4, 1887, 24 Stat. at L. 379) gave to the Interstate Commerce Commission no power to require carriers to furnish reasonable facilities or provide adequate service. But the Act of June 29, 1906 (Hepburn Act), 34 Stat. at L. 584, amending section 1 of the original act, provided that "it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor," etc.

The plaintiff, by appointment of the President of the United States, was in possession of and lawfully operating the Pennsylvania Railroad, primarily to supply the needs of the Government then at war, and secondarily as a common carrier for the general public, subject to rates, practices, etc., filed with the Interstate Commerce Commission, and subject to revision by it as in the case of other interstate carriers. According to the decision of the United States Supreme Court in Railroad Co. v. Ault, 256 U. S. 554, the corporations owning railroads taken by the Federal Government, and their former employees, were entirely excluded therefrom, and "no liability arising out of the operation of these systems was imposed by the common law upon the owner companies, as their interest in and control over the systems were completely suspended." It follows that the Director General, plaintiff in this case, is to be treated as a common carrier, upon which basis, indeed, he and the defendant dealt with each other.

In Paper Co. v. Railway Co., 241 U. S. 55, an action by the railway company for the recovery of demurrage charges, the railway company had placed an embargo upon bolts (logs less than eight feet in length) to be shipped to the paper company. The embargo was so placed at the request of the paper company because of the inadequacy of its siding for the placement of the cars. The embargo was removed at the paper company's request as to a certain number of cars, but was applied again, and bolts were shipped in violation thereof and without notice from the railway company to the paper company of the intention to ship the same, resulting in the arrival of cars in great numbers on certain days. Mr. Justice McKenna, speaking for the court, said, at page 58: "Two questions arise on the embargo: 1. Was it a violation of the Hepburn Act? 2. If so, could the railway company recover on account of the congestion of cars resulting from its removal? That act requires railroad companies to provide and furnish transportation to shippers upon reasonable request therefor, and to exact this duty of the railway company was the right of the shippers of the bolts to the paper company."

In this case, if the defendant company was bound by a contract with the shipper to receive the material, it had a right to the transportation necessary for its performance. If it had no such contract, the defendant company should have notified the shipper not to ship and notified the plaintiff not to furnish equipment. Without such fact and notice, the shipper had a right to have the transportation service. And it must be remembered that the defendant company (as appears by necessary implication from the affidavit of defence) actually received the cars and accepted the material. In the case just cited, Mr. Justice McKenna said (at page 59): "The railway company violated its duty when it agreed to the embargo; it returned to its duty when it removed the embargo, and the rights which it exercised were those which it would have had if there had been no agreement between it and the paper com-

pany. The paper company had a direct remedy if it had been under no obligation to receive the bolts; it could have peremptorily notified the shippers not to send them, and such notice, under the circumstances, was an obvious course. It could not be protected from their receipt nor relieved from the obligation of their receipt by an agreement with the railway company against the duty which the law devolved upon the latter company. This duty it was deemed necessary to impose. It is positive and should be kept clear from agreements with others than the shippers, which, in effect, stipulate for its violation. And this is the basis of our decision. If the paper company was under no obligation to receive the bolts from the shippers of them, it undoubtedly had the right to effectually notify the railway company not to receive them for shipment on its account except as it should direct. But, as we have seen, it received the cars, and this, we have said, was a recognition of the rights of the shippers."

It would thus appear that the so-called embargo was unlawful, and that everything relating thereto in the affidavit of defence is immaterial and to be treated as if the averments thereof had not been made.

Nor must it be overlooked that, in so far as the defence relies on the weather conditions and the freezing of shipments in transit, it seeks the benefit of exceptional rights and exemptions, and, therefore, falls within the rule that he who claims the benefit of an exception must bring himself fully within it: Conroy v. Pittsburgh Times, 139 Pa. 334, 339; Com. v. Marks, 248 Pa. 518, 521; Coates v. Wallace, 4 Pa. Superior Ct. 253, 257. As has already been seen, plaintiff's car demurrage rules contemplated (Rule 8, section A, par. 1) that only weather conditions, making it impossible to employ men or teams in unloading, or to remove freight from cars without injury to the freight, and (par. 2) only freezing of shipments in transit, should extend the time for unloading beyond the free time, and that the exemption should not apply when the shipments were tendered to the consignee in condition to unload. This suit being based on an average demurrage agreement, the provision in paragraph 1 is made inapplicable by Rule 9, section D, which declares that: "A party who enters into this average agreement shall not be entitled to cancellation or refund of demurrage charges under section A, paragraphs 1 and 3 . . . of Rule 8."

But, aside from this, it will be noted that the affidavit of defence does not specifically aver the existence of such weather conditions as would make it impossible to employ men or teams in unloading or to remove freight from cars without injury to the freight. The failure to aver in an affidavit what is necessary to constitute a defence brings into operation the rule that what is not alleged in an affidavit of defence is taken not to exist: Kaufman v. Mining Co., 105 Pa. 537, 542. And the same is to be said of the provision for exemption when shipments are frozen in transit, which is not among those accepted by Rule 9. There is no averment in the affidavit of defence that shipments were not in condition to unload, or that defendant had made diligent effort to unload. Nor is it alleged that the defendant served upon plaintiff, within the prescribed free time, the required "written statement that the lading was frozen upon arrival." All this would leave inapplicable to the present case Rule 8 (Exhibit A of plaintiff's statement), expressly relied upon by defendant's counsel.

It may be pertinent here to refer to the case of Davis v. Oil Co., 285 Fed. Repr. 470. There the claim was for demurrage charges which had accrued upon certain cars of cotton seed oil delivered to and accepted by the defendant. The defendant's unloading conveyor having broken down made it impos-

Director General of Railroads v. Pottstown Steel Company.

sible to unload shipments. The defendant at once notified the railroad company, requesting that an embargo be placed on all shipments of oil to its mill until it should be in a position to handle the same. The defendant likewise gave notice to its regular customers to discontinue shipments until notified. In spite of these precautions, shipments of a number of cars were made, which arrived before the broken conveyor could be repaired. After the conveyor had been repaired, the cars were delivered on the usual siding and accepted and unloaded by the oil company. The oil company was located at Timmonsville, S. C., where the cars were received. Notices of their arrival being given by the railroad company, and there being no room on the oil company's siding for more than three cars, the excess cars were held in Timmonsville on the tracks of the railroad company on demurrage from date of arrival. The suit was brought for said demurrage charges, and it was decided as follows:

"Demurrage charges are part and parcel of the transportation charges and are covered by the same rules of law; they are part of the tariff, and must be collected from the shipper or consignee of the freight to the same extent as the charge for carriage.

"That shipments to a consignee are unauthorized, and that the consignee does everything in its power to prevent the shipments, does not justify its refusal to pay demurrage charges if it has accepted and unloaded the cars."

The application of these principles to the present case means that, as here, under the pleadings, the Pottstown Steel Company must have accepted and unloaded the cars, the demurrage charges are due notwithstanding the circumstances set forth in the affidavit of defence as to embargo, notice, weather conditions, etc. Singly and collectively, they fail to bring defendant's case strictly within the exceptions relied on.

There was a suggestion in the argument on behalf of the defendant, that if the affidavit of defence is not deemed sufficient to prevent judgment, the defendant should have another opportunity to file more specific affidavits. According to Singerly v. Printing Co., 2 Pears. 110, and many other cases, the propriety of the court's granting an extension of time for the filing of a supplemental affidavit depends upon a showing by the defendant that he has an available defence and an explanation of his failure to present it in the first instance. It is not perceived how an adequate showing and explanation could be furnished in this case. Certainly there is nothing offered to the court calculated to indicate the existence of any defence other than, or additional to, what is stated in the affidavit of defence as filed. And for these reasons, if, under the Practice Act of May 14, 1915, P. L. 483, the rule still obtains that an affidavit of defence is sufficient which meets the averments of the declaration with the same degree of fullness and precision observed in them: Deacon v. Smaltz, 10 Pa. Superior Ct. 151; Zeller v. Wunder, 36 Pa. Superior Ct. 1, that rule is here inapplicable.

The allegations of the plaintiff's statement as to the number of cars handled and the amount due by defendant for demurrage are borne out by the reference to the book account attached to the statement as Exhibit B, and made part thereof, and, therefore, entitled to acceptance as true, unless specifically and effectively denied by the affidavit of defence.

The rule to show cause is made absolute, and it is directed that judgment be entered in favor of the plaintiff and against the defendant for the amount claimed, viz., $3272.31, including war tax of 3 per cent., to which sum must be added interest at the rate of 6 per cent. from March 1, 1920.

From Wellington M. Bertolet, Reading, Pa.