# Commonwealth *v.* Storey, Appellant.

*Appeals—Assignments of error—Rulings on evidence—Exceptions—Act of May 11, 1911, P. L. 279.*

1. Assignments of error to the admission or rejection of offers of evidence not supported by exceptions, will not be considered.

*Libel—Criminal law—Public officers—Candidates—Evidence—Admissions.*

2. On the trial of an indictment for libel, where it appears that both the prosecutor and the defendant were candidates for judge evidence of the defendant's admission of the fact that he was a candidate is competent.

3. In such a case it is proper to refuse to permit the defendant to

show by the prosecutor who was district attorney of the county that certain indictments had been nolle prossed, inasmuch as the record is the best evidence of such a fact.

4. On the trial of an indictment for libel it appeared that a part of the article alleged to be libelous charged that the district attorney, the prosecutor, had neglected or refused to perform his official duty in not prosecuting for bribery a county detective who was subordinate to him. The defendant offered to prove that the mayor had made investigation of the bribery charges against the detective, had called the witnesses thereof to his office, that the district attorney came to the mayor's office, saw and heard the witnesses, but refused to make information against the county detective; that the mayor himself made the complaint, and that these facts were communicated to the defendant. Objection was made that a part of the offer was inadmissible, and when counsel for the commonwealth was asked to state which part, he replied that it was a part of the offer intended to show "the result of the investigation by the mayor of the charges" against the detective. The court then sustained objection to the whole offer. *Held,* (1) that the portion of the offer objected to was not irrelevant inasmuch as it was to prove what the mayor did and not merely what he believed; and (2) because the offer related not only to the official conduct of a public officer, but also by reason of his candidacy for the judgeship to a matter proper for public investigation or information; and (3) that the rejection of the offer, however, did the defendant no harm inasmuch if it appeared that the mayor was subsequently permitted to testify fully as to all the facts contained in the offer.

5. Information based upon hearsay does not furnish probable cause for believing and charging guilt which is not inferable with reasonable certainty from the facts of which the publisher has been thus informed.

6. Where a publication relates to the official conduct of officers or men, or to any matters proper for public investigation or information, the mere truth of the matter is not the only defense which may be set up. The defendant may also show that the publication was not maliciously or negligently made, and if he does so to the satisfaction of the jury, he will be entitled to an acquittal.

7. In an action for libel the defendant may introduce evidence designed to show what information he had received from reputable persons in whom he confided, and on which he acted to rebut proof of malice. Such evidence is not to be considered as hearsay.

8. In the admission of testimony bearing on the questions of malice, negligence and intent, when the absence of these is an essential element of the defense on an indictment for libel, a liberal latitude should be permitted, and nothing reasonably calculated to show a tenable ground of defense should be excluded through technical narrowness in construing or applying the rules of evidence.

9. The publication of an untrue and defamatory statement about a public officer may be privileged depending on the occasion, the motive and the belief of the party, and the reasonableness of the grounds of belief; but to utter a defamatory lie with the intention to deceive, about a public officer, or any other person, is not privileged.

10. An excerpt from a charge, although in itself erroneous, is not a ground for reversal where it appears that if the excerpt is taken with its immediate context no error appears.

11. Malice is not to be presumed as a matter of law in a libel case or inferred by the jury from the mere fact that the person who was charged in the publication with official misconduct and the person uttering the charge were opposing candidates for a public office; but such interest in the result of the contest that the publication was intended to affect, is a pertinent circumstance if there be other evidence in the case from which a jury may infer that it induced negligence or a selfish desire to injure his opponent and benefit himself and resulted in exaggeration or undue embellishment of the charge of misconduct.

In such a case the defendant has the same right as any other citizen to publicly discuss the fitness of the prosecutor as a candidate for judge, and the fact that the defendant is also a candidate for the same office does not in any manner or degree lessen this legal right.

12. It is not the law that it is proper for public information or investigation to publish any matter without regard to its truth or falsity relating to the official conduct of a public officer, or the fitness of the candidate for public office. To so charge would make the propriety of the defendant's act to depend on the nature of the publication, thus leaving out of view the questions as to the truth of the matter charged, and as to malice and negligence.

13. In the prosecution of a libel against a public officer it is the absence of both malice and negligence which constitutes a defense, and not the absence of either.

14. Where an alleged libel charges the district attorney with failure to prosecute in a particular case because the defendant in such case threatened to make an exposure of him if he did, it is proper for the court in an action for the libel to instruct the jury as to the district attorney's duties, and as to his discretionary authority to determine whether he will personally conduct the trial of a particular case, or conduct it through his lawfully appointed assistant.

*Practice, C. P.—Points—Answers to points—Qualification of answers.*

15. Answers to points for charge should be direct, clear, unequivocal and responsive. Whilst they may, and in certain cases should, contain such qualifications, explanations or observations as will render the points clear and bring them into conformity with the facts, the evidence, or the law of the case, yet care should be taken that the party

presenting the point be given the full benefit of the legal principle expressed in it, if it is correctly and clearly stated and is pertinent.

16. Generally speaking, the addition to the affirmation of a point, of remarks not erroneous in themselves, does not constitute reversible error, but it may be error where, upon a view of the entire charge and the subject-matter, the conclusion naturally arises that the principle, clearly and correctly stated in a point was obscured or the force of the point was weakened by the addition of remarks irrelevant to it.

Argued Nov. 13, 1911.   Appeal, No. 91, April T., 1912, by defendant, from judgment of Q. S. Cambria Co., Sept. Term, 1911, No. 124, on verdict of guilty in case of Commonwealth v. Henry Wilson Storey.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Reversed.

Indictment for libel.   Before SHULL, P. J., specially presiding.

From the indictment it appeared that the libelous publication was as follows:

The law authorizes the court and the district attorney to appoint a competent man as county detective, who shall be the confidential officer of the judge and the said district attorney, to discover and prosecute, if necessary, all persons who commit crimes.

A few years ago one who shall be known, for present purposes, as "John H. Burroughs," was commissioned as that confidential officer for the present officials.   Within a short period after he began his duties he was accused of demanding and receiving hush money from four unfortunate scarlet women of Johnstown, promising that they could continue their illegal sales of liquor and other crimes without prosecution, and that he would not report the same to the district attorney nor to the court.   Under this agreement the women deposited, under the fictitious name of John H. Burroughs, the sum of $75.00 every Monday, to the aggregate sum of $600.   This was drawn by him, who the woman testified was the county detective.

Complaint was made to Mayor Wilson that certain houses of ill fame were being protected.   He investigated

the charge, believed it to be well founded, and informed the district attorney, who is a candidate for president judge, whose duty it was to prosecute on behalf of the commonwealth. The district attorney came to Johnstown and made an investigation; he was in conference with the mayor and chief of police and some of the women, who related all that had transpired, exhibiting the card with the name of John H. Burroughs written thereon, and which had been given to one of the women by the man, who, in violation of his trust, made the sinful traffic a source of revenue. After several weeks of newspaper publicity and rumors of all kinds the district attorney caused to be published a personal opinion that his confidential officer and that of the court was innocent of the charge, saying:

" The evidence placed in my hands by Mr.         's accusers, as well as that presented by him in defense, is such that I cannot in justice to him and to the record of his past services, consider him proven guilty of the charges made against him, so far as I am personally concerned, in fact, the presumption would necessarily be in favor of his innocence."

On the trial it was shown that while the district attorney was publicly proclaiming the good character of his officer, the scarlet women were sending money to the same person by addressing it to his lock box at Ebensburg.

Under these circumstances Mayor Wilson and Chief of Police Mulhollen, who are honestly trying to enforce the laws in the city of Johnstown, made informations against the accused, substantially charging him with accepting bribes and giving protection to these women. At the December Term, 1908, the grand jury found eleven bills of indictment against Burroughs, who was tried and acquitted, and the costs divided between the mayor and chief of police, and the defendant. Notwithstanding that Mayor Wilson and Chief of Police Mulhollen were faithful public servants doing their duty in protecting the public, after the district attorney had refused to do his duty, the present judge sentenced these officials to pay their portions

of the costs, which amounted to more than $200. This they paid.

It is probably the first instance where faithful public officers were even sentenced to do such a thing. The law is very clear, that where a public official acts in good faith and has probable cause sufficient to warrant making the charge, that he shall not be called upon to pay the costs, in case of an acquittal. The probable cause seems to have been sufficient for the grand jury as it found eleven bills of indictment, and subsequently Burroughs was found guilty on one of the bills.

When these cases were called for trial at the December Term, the district attorney refused to prosecute or to appear for the commonwealth, because Burroughs, the defendant, threatened to make an exposure of that official if he did appear, and making this plea to the jury he was acquitted. However, at the March Term, 1909, Burroughs was again called to trial and found guilty, and again the district attorney refused to prosecute him.

Burroughs had complete control over him, to do or not to do whatever he desired. Is a man like this fit to be judge?

During this time the district attorney was a mental and physical wreck, or in a state of collapse. The defendant moved for a new trial, principally upon the ground that a newspaper had been found in the jury room, and the court for the first time in eight years granted a new trial in a criminal case, because the jurors might have been influenced by reading a portion of the testimony which had been printed. It is likely the jurors, as well as every other person about the courthouse, had read it before the jurors retired to consider their verdict.

Thus has been the action of the court and district attorney in protecting Burroughs, who has never been called to another trial.

Some time after the trial the district attorney admitted that there was no question but that Burroughs was guilty of taking the money as charged, and further said he was

the worst man he ever knew, that, in his own words, "he was a devil."

After the present judge and district attorney had announced their candidacies for president judge in the ensuing campaign, and with my knowledge of their conception of administering justice, I did not deem that either was a proper person for that exalted position. I had been a friend of the district attorney for many years, and in March last I believed it was my duty to privately call upon him and go over the situation with him on these grounds, especially as every member of the Cambria bar was familiar with the cause of his collapse in the scarlet women case, and not a single member so far as I could ascertain, was in favor of his nomination. I told him this and we went over the scandal. I called to his attention that when he was in distress that I had offered him any services, as his appearance was lamentable; he needed legal assistance, and I told him that other members of the bar would gladly do anything they could, as we all knew he was in great mental trouble. The first time I tendered my sympathy and services he did not reply to my question: "Tell me what is the trouble; what can I do for you?" He only stared and muttered something which sounded like, "Yes, yes," and walked away. I was in sorrow for him and did not believe he knew what I had said to him, so after considering his mental condition and still desiring to help him, I went back and said, "Jim, I am your friend. Tell me what I can do?" The same glary stare and the same mutter, and again he left me. He admitted these offers had been made by me.

In the March conference he told me that his distress in 1908 was caused by some question of costs which had been raised, and that he feared a prosecution. He also told me what had been alleged as the "woman trouble," to which explanations I replied, "Why did you not tell me these things when I went to you in your trouble? No, these belated stories will not do; they will not wash; that man Burroughs, or some other man, has or will have control of

you. It will not do to have a judge who can be controlled
or influenced by any person. In my judgment, neither the
present judge, nor you, are a fit person to be judge of our
court." In this conversation he told me that he and
Judge O'Connor had gone over the scarlet woman matter,
and both had decided that Burroughs was being per-
secuted. The examination and conclusion he referred to
took place before the subject had been submitted to the
grand jury.

I told him that I had come to him because I felt it to be
my duty to do so; that if he insisted on being a candidate,
I would certainly let the people know that he was not the
right man for the bench. He became angry and called
all who were against him on account of the scarlet women,
liars, and he said he was going to be a candidate and
handed me one of his announcement cards. I then said
the conference was not a private one, but that the entire
story would be given to the public.

In the March conference I also told him that the liquor
scandals in our court would have to be eliminated, and
that it would not be a whisky court, if I could help it. I
then told him of the effort being made at that time, by him
and his friends to levy a tribute of $1,000 from a brewer,
to be used in his campaign, and that favors were to be
granted after the first of January. I said this must stop,
and added, "Jim, do you know what word I sent to the
brewer? I said, tell him not to be foolish and not waste
his money, that I expected to be judge at that time, and
he would not need any money, and that he would get his
rights, without money and without price." I also went to
his friend and told him that these liquor scandals must
cease.

It is my judgment that the successor to the present
president judge must be one who is absolutely impartial,
and who cannot be controlled by any person, and will ad-
minister the law as declared by the laws and the appellate
courts.

The pertinent question is, Is either of these candidates a

fit person to be president judge of the courts of Cambria county?

Where is the difference between the court official who lived off the scarlet women, and the two judicial officers who protected him to their everlasting shame?

At the trial Charles Troxell was asked this question: "Q. You say you talked with Mr. Storey concerning the judgeship that day or the day after Mr. Storey interviewed Mr. Leech? A. Yes, sir. Q. What did Mr. Storey say at that time about his candidacy for nomination on the republican ticket for judge? A. He said he was a candidate."

Mr. Marron: We especially object to that as incompetent and immaterial, and ask for an exception.

Exception noted by the stenographer. [2]

James W. Leech, the prosecutor, being on the stand, under cross-examination was asked the following question: "Q. What became of the indictments against these women for keeping bawdyhouses?"

Mr. Rose: Objected to.

Mr. Marron: I want to show by the witness that they were non prossed.

The Court: You can show that by the record. Exception noted by stenographer by request of counsel for defendant. [4]

Alex. Wilson, a witness for defendant, being on the stand, counsel for defendant made the following offer:

Mr. Marron: We propose to show by the witness that in April and May, 1908, he was mayor of the city of Johnstown; that in the exercise of his office he caused the arrest of three or four women for the offense of maintaining a bawdyhouse in the city of Johnstown; that on the arrest of these women, and in the course of investigation connected with their arrest and the charges mentioned, they charged they had paid money to the county detective of Cambria county; that he investigated this charge for the purpose of satisfying himself as to whether or not it was true; that he then notified the district attorney of the

county and prosecutor in this case that such charge had been made by these women, inviting him to participate in the investigation of the charges; that the prosecutor came to his office, was there confronted with the different witnesses making these charges, and the evidence in possession of the witnesses and in the possession of these different persons connected with this charge, submitted to him; that he refused to make information against James Berkebile, county detective at that time, subordinate to him in his office of district attorney; that he declared that he didn't believe this evidence; that this witness was compelled by himself and his chief of police to make charges against James Berkebile for extortion from these women and for conspiracy to extort. That on these charges he was held to the court of quarter sessions of Cambria county, 1908, and subsequently bills were found on these charges. To be followed by evidence that the prosecutor, James W. Leech, refused to participate in the prosecution in the office of mayor or upon the informations made against Berkebile as county detective. To be followed by evidence that he refused to participate in the prosecution of any of the bills found by the grand jury of Cambria county. This for the purpose of showing that the statements made in the publication set out in the indictment and alleged to be libelous in this connection were true, were evident, justified, and raised a reasonable ground of suspicion; that they were true; that the defendant in this case believed them to be true, and that he addressed and distributed the circular set out in the indictment under this belief; and that he exercised his constitutional right of criticising the prosecutor, a man at that time in public capacity, and also discussing the fitness of him as a candidate for the office of judge of Cambria county; and also for the purpose of disproving any malice in this publication. To be followed also by evidence that the facts included in this offer were communicated to Mr. Storey, and that he had reasonable ground for believing them true.

Mr. Rose: The offer is undoubtedly good in part and bad

292    COMMONWEALTH *v.* STOREY, Appellant.

Statement of Facts—Opinion of the Court.    [49 Pa. Superior Ct.

in part. It is almost impossible to interpose an objection in general on account of this.

The Court: If there is any part of the offer that is objectionable, an objection will be sustained.

Mr. Rose: Our objection is to a part of the offer in that it is not permissible to show the result of the investigation by Mayor Wilson of the charges made by these women.

We object to the offer as being irrelevant, immaterial and inadmissible as stated.

The Court: We sustain the objection and seal a bill.

Exception noted by the stenographer at request of counsel for defendant. [5]

Verdict of guilty, upon which the defendant was sentenced to pay a fine of $150. Defendant appealed.

*Errors assigned* were (1–37) various rulings as above and instructions sufficiently appearing by the opinion of the Superior Court.

*John Marron*, of *Marron & McGirr*, with him *John P. Hunter*, for appellant, cited: Briggs v. Garrett, 111 Pa. 404; Com. v. Swallow, 8 Pa. Superior Ct. 539; Smith v. Ege, 52 Pa. 419; Cooper v. Hart, 147 Pa. 594; Bacon v. Towne, 58 Mass. 217; French v. Smith, 4 Vt. 363; Com. v. Scouton, 20 Pa. Superior Ct. 503; Mulderig v. Wilkes-Barre. Times, 215 Pa. 470.

*Percy Allen Rose, Harvey Roland, John E. Evans* and *Singleton Bell*, for appellee, cited: Coates v. Wallace, 4 Pa. Superior Ct. 253; Com. v. Place, 153 Pa. 314; Conroy v. Pittsburg Times, 139 Pa. 344; Com. v. Costello, 1 Pa. Dist. Rep. 745; Bryant v. Pittsburg Times, 192 Pa. 585.

OPINION BY RICE, P. J., March 1, 1912:

There are in this case thirty-seven assignments of error. The first, third, sixth, ninth, thirteenth, sixteenth, seventeenth, eighteenth, nineteenth and twentieth relate to the admission or rejection of offers of evidence and are not

supported by exceptions.  Sec. 1 of the Act of May 11, 1911, P. L. 279, provides that it shall not be necessary on the trial of any case for the trial judge to allow an exception to any ruling of his; but, upon request by counsel immediately succeeding such ruling, the official stenographer shall note such exception.  As no exception to any of these rulings was allowed by the trial judge, or was requested by counsel and noted by the official stenographer, these assignments are dismissed.

As will be seen later, the fact that the defendant was a candidate for nomination was a relevant fact.  Therefore, evidence of his admission of the fact was competent, and the second assignment is overruled.

The subject of the fourth assignment is the refusal to permit the defendant to show by the prosecutor, who was district attorney of the county and was then under cross-examination, that certain indictments had been nolle prossed.  The court did not refuse to receive proper proof of that fact, but sustained the objection to the question for the reason that the best evidence was the record.  This was a valid reason, and the assignment is overruled.

The subject of the fifth assignment of error is the rejection of the defendant's offer to prove by the witness on the stand, that in April and May, 1908, the witness was mayor of the city of Johnstown; that in the exercise of his office he caused the arrest of three or four women for the offense of maintaining a bawdyhouse in that city; that, in the course of the investigation connected with this arrest and the charges mentioned, they charged they had paid money to the county detective; that the witness "investigated this charge for the purpose of satisfying himself as to whether or not it was true;" that he then notified the district attorney, the prosecutor in this case, that such charge had been made by these women, and invited him to participate in the investigation of it; that the district attorney came to his, the mayor's, office and was there confronted with the different witnesses making these charges, and the evidence in possession of the witnesses and of the

different persons connected with the charge was submitted to him; that he refused to make information against the county detective subordinate to him in his office of district attorney, declaring that he did not believe this evidence; that the mayor was compelled, by himself and his chief of police, to make charges against Berkebile, the county detective, for extortion from these women and for conspiracy to extort; and that on these charges Berkebile was held to the court of quarter sessions, and subsequently bills were found against him. As part of the same offer, the defendant proposed to follow the evidence of the facts above enumerated by evidence, first, that the district attorney, the prosecutor in this case, refused to participate in the prosecution in the office of the mayor or upon the information made against Berkebile as county detective; second, that he refused to participate in the prosecution of any of the bills found by the grand jury; and, third, that the facts recited in the offer were communicated to this defendant and he had reasonable ground for believing them true. The purposes of the evidence are not so clearly stated in the offer as to be free from verbal criticism; but it is reasonably apparent that the purposes were to show the truth of the statements made in this connection in the alleged libelous publication, to show that the defendant was justified in believing them to be true and in that belief addressed and distributed the circular set out in the indictment, and to disprove malice. The counsel for the commonwealth, while conceding that the offer was undoubtedly good in part, contended that it was bad in part and, therefore, was objectionable as a whole. The court then said: "If there is any part of the offer that is objectionable, an objection will be sustained." Thereupon, counsel said: "Our objection is to a part of the offer in that it is not permissible to show the result of the investigation by Mayor Wilson of the charges made by these women. We object to the offer as being irrelevant, immaterial and inadmissible as stated." This was followed by the court's ruling: "We sustain the objection and seal a bill." If, by

their specific objection, counsel meant that it was not competent to prove the conclusion the mayor arrived at as to the truth of the charge, their objection was based on a misconception of the offer. The offer was to prove what the mayor did, not what he believed. True, the mere fact that as a result of his investigation he caused a prosecution to be instituted against Berkebile, would not of itself be a material and relevant fact in this case. The materiality and relevancy of the fact arise from its being coupled with an offer to prove the district attorney's conduct with reference to the prosecution and the preceding investigation. In judging of his conduct, it was not an immaterial consideration that he knew the prosecution was instituted by the mayor of the city as the result of an investigation the latter had made and in which the district attorney was invited to participate, and not by an irresponsible person after an insufficient investigation and upon facts not brought to the notice of the district attorney. Part of the article alleged to be libelous charged that the district attorney had neglected or refused to perform his official duty with reference to this particular charge against the county detective who was subordinate to him. Therefore, it related not only to the official conduct of a public officer, but also, by reason of his candidacy for nomination for election to the office of president judge, to a matter proper for public investigation or information: Constitution of Pennsylvania, sec. 7, art. I; Act of April 11, 1901, sec. 1, P. L. 74. Upon both grounds, proof that the publication was not maliciously or negligently made was competent. The question that arose upon the offer was not whether the facts recited in it would constitute a complete defense as to the publication of the entire article, but whether they tended to establish the fact that this particular charge was true, or the fact that it was not maliciously or negligently made. The objection now suggested, that the offer did not state that the facts were communicated to the defendant before the publication was made, was not set up on the trial and is not sustained by the phraseology of the offer

taken as a whole. The specific objection that was made was not sufficient, in our opinion, to sustain the rejection of the offer, and, upon full consideration of the assignment and of the arguments of counsel upon it, we discover none that was. But was the defendant harmed by the ruling? Immediately after it was made the mayor was permitted to testify fully and at length as to the arrest of these persons; as to the charge they, or one of them, made against the county detective; as to all the communications of every kind between him and the district attorney regarding the charge and the investigation of it; as to the institution of the prosecution, the indictments found against Berkebile and the trials of them; as to the conduct and results of the trials; as to the part which the district attorney took or omitted to take in the prosecution of the cases; as to the use that was made by Berkebile's counsel before the jury of his omission to take an active part in the trials; as to the communication of all the facts to the defendant a considerable time before the publication was made; and, finally, that he felt called upon to make the information against Berkebile because the district attorney would not do so. Further, Mr. Mulhollen, the chief of police, who acted with the mayor in the investigation and the prosecutions, was permitted to testify fully and at length as to all the facts, within his knowledge, which in any way related to the conduct of the district attorney in these matters. So that we are warranted in saying that no competent evidence as to any of the facts alluded to in the offer was excluded. It follows that no error prejudicial to the defendant resulted from the ruling complained of, and, therefore, the fifth assignment is overruled.

The seventh and eighth assignments relate to the rejection of offers to prove by M. B. Stephens a conversation he had with Mr. Rose, who was, at the time, counsel for Berkebile, and which the witness communicated to the defendant in this case before the publication was made. The offer was to prove that in that conversation Mr. Rose stated to the witness that he had called on the district

attorney with reference to the prosecution of Berkebile, and stated to him that Berkebile had evidence against him of criminal misconduct (not relating to his office) and was determined to proceed against him thereon, unless the district attorney ceased or restrained the prosecution against him, Berkebile. Of course, the evidence would have established nothing against the district attorney; the most that it would have established was that the witness had the conversation with Mr. Rose and reported it to the defendant. Being mere hearsay, it was not competent evidence of what Berkebile said to his attorney, Mr. Rose, or what the latter said to the district attorney. But, it is argued, the question is not as to the competency of the evidence to establish those facts, but as to its competency to show that the defendant had reasonable ground for believing that they were facts and acting upon them. Even in that view, the offer was properly rejected, because the defendant's belief, though well founded, that Berkebile had made threats against the district attorney which were communicated to the latter, would not furnish probable cause for making the charge contained in the publication. Whatever may be said of information which is purely hearsay, as justification for publishing a defamatory charge against another, it is quite clear that information thus derived does not furnish probable cause for believing and charging guilt which is not inferable with reasonable certainty from the facts of which the publisher has been thus informed. These assignments are overruled.

The twelfth, fourteenth and fifteenth assignments may be considered together. Alvin Sherbine, a witness called by the defendant, was permitted to testify to part of a conversation he had with Mr. Rose, the whole of which he, the witness, communicated to this defendant before the publication was made. The part of the conversation to which he was permitted to testify was, in substance, that Mr. Rose stated to the witness that Berkebile had stated to him, Mr. Rose, that he was going to prosecute the district attorney; that he, Mr. Rose, said to Berkebile

that he did not want to go into that; that Berkebile told him to go on with the case and if it came to that he would make arrangements in engaging other counsel; that then Mr. Rose said to Berkebile, "If Leach [the district attorney] stays out of this case and lets you alone, that is all you want, that will satisfy you?" that Berkebile responded in the affirmative; whereupon Mr. Rose said to him, "I will see Leach." The witness further testified that Mr. Rose said he then went to the district attorney's house and "told him." At this point the objection was made to the witness's proceeding further and to the offers to prove that Mr. Rose said (1) that the district attorney said, in reference to Berkebile's threat, that if that charge was made against him he was ruined and his aspirations and political ambitions were at an end; (2) that he, Mr. Rose, had in his possession an interview printed in a newspaper on a certain date, and that, if the district attorney had appeared in the trial of the first Berkebile case, he intended "to flash that interview upon him and that would make him withdraw from the trial." Obviously, there was no error in rejecting the second part of the conversation, and, while there is more plausibility in the contention that the first part ought to have been admitted, we are of opinion that it was properly rejected, for the reasons suggested in our discussion of the seventh and eighth assignments. Therefore, the fourteenth and fifteenth assignments are overruled.

A more serious question arises upon the rejection of the offer to prove that in the same conversation Mr. Rose stated to the witness that there was no doubt that Berkebile "controlled" the district attorney. It is urged that this was a mere expression of opinion. But it is to be borne in mind that the statement came from one who was attorney for Berkebile and who had communicated Berkebile's threat to the district attorney, as well as Berkebile's proposition that, if the district attorney would stay out of the case against him and let him alone, he would not pursue the criminal charge against the district attorney. One conducting such negotiations was in a very different posi-

tion to know the truth of his statement than a mere stranger would have been, and a jury might well find that his statement was not a mere expression of opinion, but an assertion of a fact within his knowledge. Moreover, it was a statement which, in its essentials, was the very charge made in the alleged libelous publication. Of course, it had no tendency to establish the truth of the matter charged in the publication, and was not admissible for that purpose. But that is not the only defense which may be set up where the publication relates to the official conduct of officers or men in public capacity, or to any matter proper for public investigation or information. On its face, the publication in question was of this qualifiedly privileged character, and, by the explicit provision of the constitution, there could be no conviction if it be proved to the satisfaction of the jury that it was not maliciously or negligently made. Therefore, whether constituting a complete defense or not, legitimate proof of lack of actual malice is a step in the direction of establishing a ʼcomplete defense, and, as such, is admissible. But it is urged that evidence of Mr. Rose's statement, and of its communication to the defendant, was not admissible, even upon the question of actual malice, because it was mere hearsay. This is not a conclusive reason for the rejection of the offer. The rules of evidence are not so strict as invariably to exclude evidence of information received from others. It does not necessarily follow, because the words in question are those of a third person not under oath, that, therefore, they are to be considered as hearsay. What may be hearsay upon one issue may be original evidence upon another. "Thus, where the question is, whether the party acted prudently, wisely, or in good faith, the information on which he acted, whether true or false, is original and material evidence. This is often illustrated in actions for malicious prosecution:" 1 Greenleaf on Ev. (15th ed.), sec. 101. "Defendant (in an action for malicious prosecution) may introduce evidence designed to show what information he had received from reputable persons in whom he

confided and on which he acted to rebut proof of malice; but evidence which has no tendency to disprove malice should be excluded:" 26 Cyc. of Law & Pro. 98. Amongst the cases cited in support of the first branch of this proposition are, Bacon v. Towne, 58 Mass. 217; Pullen v. Glidden, 68 Me. 559; LeClear v. Perkins, 103 Mich. 131. Counsel also cite Lamb v. Galland, 44 Cal. 609; Anderson v. Friend, 71 Ill. 475; Pa. Company v. Weddle, 100 Ind. 138, and French v. Smith, 4 Vt. 363. In Smith v. Ege, 52 Pa. 419, it was said: "Probable cause does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting. It has been variously defined as such a suspicion as would induce a reasonable man to commence a prosecution: Cabanes v. Martin, 5 Dev. 454; or a reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offense: Munns v. Dupont, 3 Wash. C. C. 31; or as in our own cases, a deceptive appearance of guilt arising from facts and circumstances misapprehended, or misunderstood, so far as to produce belief: Seibert v. Price, 5 W. & S. 438, and Beach v. Wheeler, 30 Pa. 69. The substance of all these definitions is a reasonable ground for belief of guilt. It can make no difference what induces the belief, if it be reasonably sufficient. While mere floating rumors are not an adequate foundation for it, plainly representations of others may be, and especially representations made by those who have had opportunities for knowledge, or who have made an investigation." An examination of the facts of that case, as set forth in Judge STRONG's opinion, shows that the defendant in the action for malicious prosecution acted upon the representations of detectives, public officers, as to facts they had ascertained from others, and not on facts within his own knowledge. It was held that these representations furnished a reasonable ground for belief and, therefore, the court did not err in admitting proof of them. In Bacon v. Towne, 58 Mass. 217, it was held, that to rebut malice defendant

may prove that a certain person communicated to another, with a request that the latter would make it known to defendant, the fact that the former saw plaintiff do the criminal act of which he was accused, and that this information was communicated to defendant before the complaint against plaintiff was made. These were cases of malicious prosecution, but in Briggs v. Garrett, 111 Pa. 404, the close analogy between such cases and actions for libel was pointed out, and, therefore, the citations are none the less pertinent in a prosecution for libel, as showing that the objection that information received from others is hearsay, is not necessarily conclusive against the reception of such evidence upon the issue of actual malice. "In the admission of testimony bearing on the questions of malice, negligence and intent, when the absence of these is an essential element of the defense on an indictment for libel, a liberal latitude should be permitted, and nothing reasonably calculated to show a tenable ground of defense should be excluded through technical narrowness in construing or applying the rules of evidence:" Com. v. Swallow, 8 Pa. Superior Ct. 539, at page 609. Without discussing the question farther, we conclude that, in view of the source from which the information came, the evidence was admissible, not as in itself establishing a complete defense, but as an item of evidence tending to repel the inference of actual malice. The twelfth assignment of error is sustained.

The tenth and eleventh assignments require but brief notice. They relate to the rejection of offers to prove that the women who had been witnesses in the prosecution of Berkebile were in Johnstown and within the jurisdiction of the court after the December sessions, 1908, and the March sessions, 1909. There was no offer to prove, in connection with this, that this fact was known to the district attorney, and the testimony would not be contradictory of anything that he had testified to. We cannot see that there was any error in rejecting the offers. Therefore, the assignments are overruled.

The remaining assignments of error relate to portions of the general charge to the jury and to answers to points submitted by the defendant.

The learned judge said to the jury (twenty-first assignment): "A publication may be privileged, as such, when it has been shown that it is true, and if a party publishing it can satisfy a jury that it was for the public benefit, then it would excuse the publication." If this were all the instructions that were given upon the law of privileged communications and the defense that may be made thereon, it would be open to the just criticism that it did not go far enough to guide the jury in the event of their failing to find the publication to be true, and, perhaps, also, to the criticism that it tended to create the impression that proof of the truth of the publication was essential. But the immediate context shows that it was intended, not as a statement of the only instance, but of one instance in which the law of privilege would apply and excuse. Thus viewed, the instruction did not contain reversible error, and, therefore, the assignment is not sustained.

After reading to the jury sec. 7, art. I, of the constitution and saying to them that it is the right and privilege of the public to know all of the conduct of its officers and that, when they in any wise "neglect their duties or violate the oath of their office," it becomes a matter for public discussion, the learned judge said: "But you will recall that in this conduct of officers, they cannot be criticised for a matter that does not exist, and in order to be privileged, it must be made at a proper time, on proper cause and on proper motives." The instructions quoted, standing by themselves, would be inaccurate and misleading, because they seem to imply that the test is, whether the officer has been guilty of the dereliction of official duty which the publication charges and criticises. This construction of the constitutional provision would logically lead to the conclusion that nothing but proof of the truth of such publication would establish proper cause, and that to this must be added proof that it was made at a proper time

and on proper motives. Such construction would seriously impair the efficacy of the constitutional defense that the publication, though not true, was made without negligence and without malice, and it would not be in accord with the law governing publications qualifiedly privileged. To utter a defamatory lie, that is, to publish a defamatory falsehood, with the intention to deceive, about a public officer or any other person, is not privileged. But publication of an untrue and defamatory statement may be, depending on the occasion, the motive, and the belief of the party, and the reasonableness of the grounds of his belief. The distinction was thus lucidly stated and illustrated by Justice PAXSON, in Briggs v. Garrett, 111 Pa. 404: "A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice and he cannot shelter himself behind the doctrine of privileged communications. I may illustrate this by the familiar instance of an inquiry into the character of a servant. If I say I believe him to be a thief upon information derived from others, or from facts and circumstances within my own knowledge,—in other words, if my statement is based upon probable cause, the communication is privileged and I am not responsible, even though it should appear that I was entirely mistaken. If, on the contrary, I knowingly and falsely accuse him of dishonesty, such charge is not privileged and I am liable in damages for the consequences of such statement." The same distinguishing principles are to be observed in the trial of a criminal case for libel, where the publication alleged to be libelous relates to the official conduct of public officers. In view of the defense set up in the present case, and of the evidence adduced to support it, it was highly important that the jury should be given to understand that the case did not depend solely on the question whether the district attorney had been guilty of the dereliction of duty charged in the publication; and we are constrained to say that the portion of the charge last quoted did not adequately pre-

sent to the jury the true test. But immediately following it, and embraced in the same assignment of error, we find the instructions that it was for the jury to determine "Whether the defendant was actuated by malicious or proper motives in the publication which he has made, because, if he were not thus actuated by malicious or improper motives, it would be your duty to acquit him." We are not clearly convinced that this concrete statement relating to the particular paper was insufficient to preclude, in the minds of the jurors, any misconception that the preceding abstract statement might have produced. Therefore, we do not reverse on this assignment; but, as the case must go back for retrial on other grounds, we have deemed it wise to suggest the criticism that the first portion of the instructions is open to.

In the instructions complained of in the twenty-third assignment, the court gave the generally accepted definitions of the terms privileged communication and probable cause, and then stated that it was for the jury to determine whether or not the publication was made under circumstances which were sufficiently strong to warrant any cautious or prudent man in believing that the facts he had set forth in the article were true. This was followed by the instructions of which particular complaint is made: "Then further (we quote from the assignment) you will determine whether or not his motives were proper. Did the charge or allegation emanate from his interest as a citizen in the uplift to the judiciary, or in his own personal desire for elevation to the office, or to satisfy his ambition and to gratify a vicious mind?" While, under all the evidence, this was a pertinent inquiry upon the questions of actual malice and negligence, we agree with counsel for the defendant that malice is not to be presumed as matter of law, or inferred by the jury from the mere fact that the person who was charged in the publication with official misconduct and the person uttering the charge were opposing candidates for a public office. To hold that it may be, would be to set up a different standard of privilege by

which to judge the utterances of a candidate regarding the fitness of his opposing candidate, than is applied to the utterances of other persons regarding the same subject; and for this we find no warrant in law. But such interest, like any other personal interest in the result of the contest that the publication was intended to affect, is a pertinent circumstance if there be other evidence in the case from which a jury may infer that it induced negligence or a selfish desire to injure his opponent and benefit himself, and resulted in exaggeration or undue embellishment of the charge of misconduct; as, for example, by distorting the facts or putting a false color on innocent acts. Therefore, we do not sustain this assignment. But, while we are on this subject, we are constrained to remark emphatically that the defendant was entitled to an unqualified affirmation of his fifth point (thirty-second assignment), which was as follows: "The defendant has the same right as any other citizen of the county to publicly discuss the fitness of the prosecutor as a candidate for nomination to the office of president judge and the fact that the defendant was also a candidate for such nomination does not in any manner or degree lessen this legal right." This was an unambiguous statement of an undoubted legal principle pertinent to the case, which it was highly important to the defense should be laid clearly before the jury. It was not so worded as to be susceptible of being misinterpreted by them to mean that the right referred to in the point rendered the defendant immune from prosecution or conviction for his utterances. Indeed, we can see no occasion whatever for adding to the ostensible affirmation of the point the remark, "but we say to you that if the defendant in this case through his zeal or ardor, or by reason of the fact that he was a candidate overstepped the bounds and published an article that was not truthful and was libelous in its character the defendant may be found guilty of the crime of which he is charged." These remarks were not explanatory of the point, nor did they relate to a subject upon which the court had not adequately instructed the

jury. They tended, rather, to draw the minds of the jurors away from the legal principle, clearly and concisely expressed in the point, to another consideration, namely, the interest of the defendant as a candidate as affecting his motives and action. As has been seen in the discussion of the twenty-third assignment, this subject had been very pointedly called to the attention of the jury. The defendant was entitled to have his right, notwithstanding his candidacy, to publicly discuss the fitness of his opponent given equal prominence; but the repetition, in this connection, of the idea which had been so forcibly brought to the attention of the jury by the remarks quoted in the twenty-third assignment, tended to give the principle expressed in the point less prominence. Answers to points for charge should be direct, clear, unequivocal and responsive. Whilst they may, and in certain cases should, contain such qualifications, explanations or observations as will render the points clear and bring them into conformity with the facts, the evidence, or the law of the case, yet care should be taken that the party presenting the point be given the full benefit of the legal principle expressed in it, if it is correctly and clearly stated and is pertinent: Sheetram v. Trexler Stave & Lumber Co., 13 Pa. Superior Ct. 219. This statement is supported by a multitude of authorities. Generally speaking, the addition to the affirmation of a point of remarks not erroneous in themselves does not constitute reversible error; but it may be error where, upon a view of the entire charge and the subject-matter, the conclusion naturally arises that the principle, clearly and correctly stated in a point, was obscured or the force of the point was weakened by the addition of remarks irrelevant to it. While the cases are not numerous, there are well-considered cases in which the addition of such qualifying remarks, in answer to points which the party was entitled to have affirmed without qualification, has been held to constitute reversible error. Amongst them we refer to Citizens' Pass. Ry. Co. v. Ketcham, 122 Pa. 228; Lingle v. Scranton Ry. Co., 214

Pa. 500; Sheetram v. Trexler Stave & Lumber Co., 13 Pa. Superior Ct. 219. See, also, Kaufhold v. Arnold, 163 Pa. 269, and Lancaster v. Kissinger, 11 W. N. C. 151. In the latter case, Justice PAXSON said: "It is much better, when a point can be affirmed, to say so. When affirmed with a qualification or in language different from the point itself, it is very apt to mislead the jury. It certainly weakens the force of the point with them." After full consideration of the assignment, we conclude that it must be sustained upon the ground that the qualifying remarks tended to weaken the force of the point with the jury, and, taken in connection with the other remarks to which we have alluded, to give undue prominence, relatively, to the defendant's interest as a candidate. If the latter was to be emphasized and given great prominence, it was important, in order that the jury be not misled, that they be as plainly and as emphatically instructed that, so far as the right to discuss the fitness of his opposing candidate was concerned, he stood on precisely the same plane as any other citizen.

If, by his first point (thirtieth assignment), the defendant had asked the court to charge that the alleged libelous paper related, on its face, to the official conduct of the district attorney, and, by reason of his candidacy for nomination as a candidate for the office of president judge, to a matter proper for public information, there would have been propriety in affirming it. Thereby the jury would have been clearly and definitely informed that it was of the class of publications to which the constitutional provision heretofore referred to relates. And it was important to the defendant that this be made plain. Perhaps this was all that the draughtsman of the point intended; but unfortunately it was so worded that it might have conveyed the impression to the jury that it was proper for public information to publish the article. This would have been going much farther than the constitutional provision goes. It is not the law, and no one contends it to be, that it is proper for public information or investigation to

publish any matter, without regard to its truth or falsity, relating to the official conduct of a public officer or the fitness of a candidate for public office. If the matter alleged be true, and the privilege be not lost by the manner in which it is set forth, no presumption of malice arises from the publication of it; and without malice there can be no conviction. If it be untrue, still the publisher cannot be convicted if it be shown to the satisfaction of the jury that it was made without malice and without negligence. But it is one thing to charge the jury that the article in question belongs to a class of privileged communications to which these principles apply, and another and an entirely different thing to charge "that the publication thereof is proper for public information." The latter form of instruction, in the present case, would make the propriety of the defendant's act to depend on the nature of the publication, thus leaving out of view the questions which fairly arose upon the evidence, as to the truth of the matter charged and as to malice and negligence. As the point was susceptible of an interpretation by the jury that would make it erroneous and misleading, it was properly refused, and, therefore, this assignment is overruled.

The question raised by the thirty-fourth assignment is, whether, even though the jury found that the publication was untrue, yet, unless they also believed, from all the evidence, that the defendant had express malice in making it, he must be acquitted. We do not so understand the constitutional provision. There may be negligence without express malice. It is absence of both, not the absence of either, that, under the constitution, constitutes a bar to conviction for the publication of untrue and defamatory matter, even in the exceptional class of cases mentioned in the section. This assignment is overruled.

The rule as to probable cause was thus stated in Com. v. Swallow, 8 Pa. Superior Ct. 539, at page 604: "Probable cause for belief excludes negligence. This probable cause is judicially defined as 'a reasonable ground of suspicion, supported by circumstances sufficient to warrant a cau-

tious man in believing that the party is guilty' of the. conduct imputed to him: Munns v. Dupont, 3 Wash. C. C. Rep. 31; Winebiddle v. Porterfield, 9 Pa. 137; Chapman v. Calder, 14 Pa. 365; Smith v. Ege, 52 Pa. 419; Coates v. Wallace, 4 Pa. Superior Ct. 253. And this cause must exist at the time of making the publication. It is obvious that the probable cause that will warrant belief must be found in circumstances of adequate probative force, lying within personal knowledge, or information derived from sources of such a character as to lead a reasonably prudent man to regard it as trustworthy." The test is not whether the circumstances and information were sufficient to induce belief in the defendant, but whether they were sufficient to lead a reasonably prudent man to believe the party guilty of the conduct imputed to him. Judged by this test, the points the refusal of which are the subjects of the thirty-first, thirty-third, thirty-fifth and thirty-sixth assignments, are faulty, inasmuch as they seem to rest the question upon the defendant's belief. This would be an unsafe rule, particularly as applied to one whose interest might affect his judgment. The learned judge evidently had this view, for, while he refused the point quoted in the thirty-first assignment, he reiterated it with the insertion of the words, "upon information sufficient to warrant a cautious or prudent man to believe that such publication was true." Another objection urged against the points is, that practically they make proof that the defendant was not negligent in forming his belief of the truth of the charges a complete defense to the prosecution, without regard to the question of motive or malice. In the contingency of the jury finding that the defamatory part of the publication was not true, this would be an incorrect statement of the law they were to apply, for, as we have already pointed out, it is the absence of malice and negligence which constitutes a defense in such a case. To make a communication privileged, it must be made upon proper occasion, through proper motives, upon reasonable cause, and in the proper manner: Mulderig v. Wilkes-Barre

Times, 215 Pa. 470; Neeb v. Hope, 111 Pa. 145; Briggs v. Garrett, 111 Pa. 404; Conroy v. Times, 139 Pa. 334; Jackson v. Times, 152 Pa. 406. We conclude that the refusal of these points was not erroneous, and that the answer to the third point (thirty-first assignment) contained no error of which the defendant can complain.

A part of the charge made in the publication was, that when the Berkebile cases were called for trial the district attorney refused to prosecute or to appear for the commonwealth because the defendant in the cases threatened to make an exposure of him if he did, and that the defendant "had complete control over him to do or not to do whatever he desired." This charge was followed by the query: "Is a man like this fit to be judge?" The fact was that the district attorney took no real part in the trials, the commonwealth's side of the cases being conducted by the assistant district attorney, who was assisted by Mr. Stephens and by Mr. Storey, the defendant in this case. The trial of the first batch of cases resulted in acquittals and the imposition by the jury of the costs on Mayor Wilson and Chief Mulhollen, who were the prosecutors. On the subsequent trial of the second batch of cases Berkebile was found guilty, but subsequently a new trial was granted. If the charge had been simply that the district attorney did not personally appear and prosecute the cases, the evidence would have amply justified a finding that it was substantially true. But it went further than that and asserted that he was controlled by the defendant in the cases and was deterred from doing his duty by the latter's threats. Thus, the question of the truth of the charge, as a whole, involved the question, whether the action of the district attorney was impelled by the unworthy motives imputed to him, or was taken in the honest exercise of his official judgment. Therefore, we cannot agree with appellant's counsel, that it was the good faith of his client, and not the good faith of the district attorney, that was in issue in the case. The very nature of the charge, the defendant's insistence, on the trial, that it was true, and the evidence brought the

good faith of the district attorney in issue. Hence, it was not error, but quite appropriate, for the court to instruct the jury as to a district attorney's duties and as to his discretionary authority to determine whether he will personally conduct the trial of a particular case or conduct it through his lawfully appointed assistant. It is true, that, in instructing the jury upon this matter, the learned judge expressed a pretty strong opinion as to the good faith of the district attorney's action in these cases against Berkebile, but still he left this question, as well as the question of the defendant's good faith in making the accusation, to the jury, and we are not convinced that he exceeded the limit to which a judge may go, in expressing an opinion upon the evidence, without committing reversible error. Therefore, the twenty-fifth, twenty-seventh and twenty-eighth assignments are overruled.

But in the course of his discussion of this subject, the learned judge said (twenty-fourth assignment): "There are cases which come into the court where there are cross prosecutions that place a district attorney in a position by reason of information that he has gleaned upon one side, particularly where the cases are tried together, that might justify his withdrawing from a case and intrusting it to other persons under his authority or direction to prosecute the cases. Was that the condition that arose in the matter of the cases generally known as the cases of the commonwealth against Berkebile?" Possibly he meant by these remarks merely to give an illustration, but we are not satisfied that a jury would so understand them. To say the least, it was an inapt illustration. The remarks seem to submit to the jury to decide whether the condition described arose in the Berkebile cases, and to suggest, impliedly, that, if it did, it would explain and justify the district attorney's action. We find no evidence that would support a finding that that condition arose. It is error to submit to the jury to find a fact as to which no evidence has been given. This is not always harmful error and ground for reversal, but it may be. In view of

the learned judge's strong expression of opinion upon the good faith of the district attorney, to which we have alluded, not much more would be required to turn the jury in the commonwealth's favor upon that question, and these remarks may have had that effect. Being unable to conclude satisfactorily that no possible prejudice to the defendant could arise from them, we are constrained to sustain this assignment.

In the instructions embraced in the twenty-sixth assignment, allusion was made to the allegation of the publication, that the costs of prosecution in the Berkebile cases were imposed on the prosecutors and that they paid them. Allusion was also made to the mayor's admission, on cross-examination, that he did not pay them personally, and this admission was brought to the attention of the jury, coupled with the significant inquiry: "Was this declaration made with the proper motive and with the intention to furnishing to the voters of Cambria proper information in regard to the candidate that was seeking their franchise?" The material part of the declaration, namely, that the costs had been imposed on the prosecutors, was true, and even that was not defamatory. Moreover, there was no evidence that the costs had not been paid, or that the record failed to show that they were paid, or, if they had not been paid, that this defendant knew it. In determining whether the acquittal of Berkebile and the imposition of the costs on the prosecutors were attributable, in whole or in part, to the nonactivity of the district attorney in the prosecutions, it was wholly immaterial whether the prosecutor had personally paid the costs or not. That trivial discrepancy between the statement and the proof was insufficient ground upon which to base a finding by the jury that the statement was made from improper motives. We cannot agree with the learned trial judge that so great significance could be attached to it.

The instructions embraced in the twenty-ninth assignment relate to the allegation of the article, that an effort was being made by the district attorney and his friends to

levy a tribute of $1,000 from a brewery, to be used in his campaign for the office of judge, and that favors were to be granted after the first of January. After reading this to the jury, the court called attention to the prosecutor's testimony in denial of the charge, so far as he was concerned, and then said: "This then would establish malice on the part of the defendant in the publication of the article, or that portion of it, unless you find that there was justification by the defendant. Wherein does that justification appear by the evidence in the case?" After thus unqualifiedly imputing to the testimony of the prosecutor absolute verity and casting on the defendant the burden of showing "justification" for the charge, the court proceeded: "You will recall the testimony of Mr. Storey when upon the witness stand and asked in reference to this, he stated that he went to Barker and that he told him a man named Barney Rice had called on him and he said he was the agent of the Du Bois brewer; that he didn't go over the matter with Mr. Leach in relation to the Barker proposition. Is there anything in his statement, or any portion of his testimony, that tends to show a justification for that allegation in the article published?" Obviously, the portion, and the only portion, of the defendant's testimony that the court brought to the attention of the jury furnished no justification or even excuse for the publication. But this was not the purport of the whole, or of the significant part, of his testimony, relative to the negotiations between the political friends of the prosecutor and a brewer outside the county for money to be contributed by the latter for use in the prosecutor's campaign for the office of president judge. Hence, if the accusation of the publication had been confined to their action, the manner in which the court alluded to the defendant's testimony would have been misleading, because of its tendency to convey to the jury the impression that the other parts of the testimony were deemed by the court immaterial. It is to be observed, however, that the accusation of the article was that the prosecutor himself, as well as his po-

litical friends, was party to the negotiation, while the information which the defendant testified he received and acted upon did not so clearly and directly connect him with the negotiations. Upon comparison of one with the other it is not clear that the submission of the question to the jury without more detailed recital and analysis of the defendant's testimony constituted prejudicial error. Nor was there impropriety in treating the subject by itself, or in stating to the jury that, if the charge of libel as to this part of the publication was sustained, the defendant could be convicted, even though the charge of libel as to the other parts of the publication was not sustained. This assignment is overruled.

The last assignment is to the court's refusal of the defendant's point for binding direction. We need not discuss this at length; enough has been said to show that the case was for the jury.

The judgment is reversed and a venire facias de novo is awarded.